## Colovos' Adm'r et al. v. Gouvas et al.

(Decided June 25, 1937.)

B. S. HUNTSMAN for appellants.

LAURENCE B. FINN and RODES & WILLOCK for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming.

On the night of August 8, 1935, A. Colovos, aged fifty-six, his wife forty-four, and their daughters, Mary

and Dorothy, aged fifteen and ten, were returning from Chicago to their home in Bowling Green in an old model closed car. Mrs. Colovos it is believed was driving as was her custom, and the father and girls were on the back seat. It had been raining, the road was slightly slippery, and from marks it appeared that the car had gone to the extreme right side, the wheels over the shoulder, then a sudden turn to the left, turning completely over on its side, headed in the opposite direction from its former course. The four occupants, the entire Colovos family, were burned to death in the car. No witness saw the machine turn over or catch fire. The accident occurred near midnight.

Mr. Colovos left surviving him several brothers and sisters some living in Bowling Green, others in Athens, Greece. Mrs. Colovos (sometimes called Frazella, and sometimes Carmella) was survived by her mother, Mrs. Charbonneau, who lives in Bowling Green.

The Bowling Green Trust Company, as administrator of each of the four estates, filed a petition asking that they be settled. The brothers and sisters of Colovos and the mother of Mrs. Colovos were named as defendants. It was alleged that Colovos, his wife and two daughters had met death in a common disaster, all dying intestate; that Mr. Colovos died possessed of some real estate and personal property, including as claimed, proceeds of various insurance policies. The wife had one insurance policy, and some personal effects. The children each held small insurance policies.

Mrs. Charbonneau, mother of Mrs. Colovos was the first to answer, alleging that she, being the sole heir of Mrs. Colovos was entitled to receive all of her estate, and a moiety of the estates of the children. She stated that she had agreed that the family all died in a common calamity, and suggested that there had been an agreement looking to an equitable distribution of the estates. Later, she filed an amended answer raising an issue. The administrator by amended petition admitted that at the outset there was pending an agreement for adjustment, but that a later conference resulted in a misunderstanding, and no settlement could be reached. It averred that there existed between the parties an actual controversy which should be determined before attempted settlement of the estates. The representatives of the estate of Mrs. Colovos and her two daughters were realigned as de-

fendants. It was alleged that since the whole family perished at the same time in a common disaster, the proceeds of five policies on the life of Colovos belong to his estate, to be distributed under the laws of descent, to his heirs at law. The questions to be determined relate to the distribution of the proceeds of these policies and payment of funeral expenses of the mother and daughters.

The administrator of the estate of the mother and daughters denied the assertion in the petition that it was impossible to ascertain the order of deaths of the members of the family, ''on the contrary they aver that A. Colovos predeceased Frazella Colovos,'' thus claiming by reason of survivorship that the proceeds of Colovos' several policies should be paid to the wife's administrator, and administered accordingly. Mrs. Charbonneau took the position that Colovos and the two daughters predeceased the wife and mother, and that as the sole heir she is entitled to the proceeds of the several policies in which the wife was namd as beneficiary. The issue of survivorship was thus raised.

The trust company as administrator of the mother and daughters respectively, moved the court to transfer the cause from the equity to the ordinary docket for the purpose of hearing proof on the question of survivorship. The court sustained the motion, and ruling that the burden of proof rested upon those asserting survivorship, impaneled a jury. After hearing proof the court, over the objection of the others, sustained the motion of the Colovos estate and his heirs to so do, and instructed the jury to say, which it did by a verdict, that it was impossible to determine which one of the four persons survived the others. The case then went back to the equity docket, carrying with it by agreement all the proceedings had while it stood on the ordinary docket. The court then rendered judgment holding that all the family had died in a common calamity, at the same time, and the burden being on the propounders of survivorship, since they had failed to establish the prior death of the father and husband, the administrator of Colovos estate was entitled to hold and distribute to his heirs the proceeds of the five policies in accordance with our laws of descent and distribution.

The first contention urged by appellant is that the court improperly placed the burden of proof on those

who were asserting Colovos' prior death. In treating this question, we shall discuss it from the standpoint of the issues. Civil Code of Practice, secs. 525, 526, provide that the party holding the affirmative of an issue must produce evidence to establish it. The burden in the entire action lies upon the party who would be defeated if no evidence were produced on either side. Under the Roman law, presumption was indulged as to the order of death where persons were victims of a common disaster. Under the common law there is no such presumption. The presumption does not prevail in England, nor in the great majority of the states which adhere to the common law. Two notable exceptions wherein the civil law presumption as to the order of death arising from differences in sex, age or physical condition, where deaths occur in common disaster is recognized, are California and Louisiana. In all jurisdictions save those noted:

"The law * * * treats the case as one to be established by evidence, and lays the burden of proof on him who claims survivorship; and, if there is no proof as an ascertainable fact, which, not being established by him who has the burden, results in his failure to meet a condition precedent to his success. * * * In the absence of evidence from which the contrary may be inferred, all may be considered to have perished at the same moment; not because that fact is presumed, but because from failure to prove the contrary by those asserting it." 8 R. C. L. 716, 717.

"In few jurisdictions, by statute, survivorship is presumed as between persons who have perished in a common calamity, from the probabilities resulting from strength, age and sex, according to specified rules. But, the general rule is that where several persons perish in a common disaster, notwithstanding differences of age, sex and physical strength, there is no presumption as to survivorship, but it is a fact to be proven by the party asserting it." 17 C. J. 1179.

In jurisdictions where the majority rule prevails it is held that "such rule is applicable where the insured and beneficiary die in a common disaster, so that as between the claimants of the proceeds of life insurance policies * * * if there is not proof of actual survivor-

ship, the claimants on whom the law casts the burden of proving survivorship, must fail in his claim." Cyc. of Ins. Law, Couch, vol. 2, sec. 341. Citing Middeke v. Balder, 98 Ill. App. 525; Cowman v. Rogers, 73 Md. 403, 21 A. 64, 10 L. R. A. 550; Fleming v. Grimes, 142 Miss. 522, 107 So. 420; 45 A. L. R. 618; Watkins v. Home L. & A. Ins. Co., 137 Ark. 207, 208 S. W. 587, 5 A. L. R. 791, and other cases. See, also, Young Women's Christian Home v. John French, Adm'r, 187 U. S. 401, 23 S. Ct. 184, 47 L. Ed. 233; St. John v. Andrews Institute, 191 N. Y. 254, 83 N. E. 981, 14 Ann. Cas. 708; Supreme Council v. Kacer, 96 Mo. App. 93, 69 S. W. 671; Johnson v. Merithew, 80 Me. 111, 13 A. 132, 6 Am. St. Rep. 162.

Since Kentucky has no statute with relation to the question of survivorship where deaths occur in a common disaster, the common-law rule prevails. See Palmer v. Turner, infra. We therefore follow the rule as announced by a majority of the courts, and which was the ruling of the trial court.

It is urged by appellant that the court erred in peremptorily instructing the jury to return the verdict mentioned above. It is not argued that the jury might have determined from the evidence the precise order of the deaths of the four members of the family, but from the proof the jury might have found that the mother or one or the other of the girls survived the husband and father.

The first person to arrive at the scene after the car turned over was a Mr. Thurman who was driving a truck northwardly, and had seen an unusual light when quite a distance away. He drove within 100 feet of the burning car, stopped his truck and walked to it. The car was then burning fiercely under the hood, flaring up 4 or 5 feet high, and as he thought in the front floor board. He did not discern any person in the car because of smoke and flames. Considering it to be the best thing to do, he kicked in the back window and saw human bodies in the car. About that time, or shortly after, he heard a female voice say, "Oh Lord, Oh Lord." He knew none of the family and could not identify the voice. The most he could say was that "it sounded like a female voice."

As Thurman started back to his truck to get something with which to break in the top of the car, he noted

that gas had flowed from the supply tank, all around the car and caught fire. There was an explosion and then there was a "real fire." He described what he saw when he broke the rear window. No one was in the front seat. The man was leaning over, and it looked like a girl or woman leaning on him on his left-hand side on the rear seat. Later when the flames become more intense, he could see a third body on the back seat "down, you might say, by the side of the seat."

Lewis Glover, driving a truck southwardly, saw the flames from some distance. He drove to within 200 or 300 feet of the burning car, walked toward it, and when about 150 feet away he heard a scream that sounded like the voice of a woman or child, and immediately there was an explosion and the flames leaped high into the air. This witness saw a man running toward the burning car (undoubtedly Thurman), but no other sign of life.

Earl Williams and his wife lived about 100 yards from the place. It was about midnight when she and her husband heard a crash and agreed that it was an automobile wreck. They got out of bed and went to the front of the house. They testified: "The flames were going rather high at the time, then horrible screams, and then all was silence." They could not say whether the voice or voices were of a male or female, but were inclined to think the sound indicated the latter. Mrs. Williams saw a man drive up, leave his truck and go toward the burning car, and heard and saw the explosion as he was going back to his truck.

One witness who lived nearly a mile from the place of the accident arrived evidently quite late. He testified that "the car was afire all over"; that there were four people in the back of the car, and they were burned beyond recognition, "except the youngest girl who was in a kneeling position." "After I stood and looked in the window a few minutes, it looked just like she twitched or moved a little bit. That's just my best recollection of it."

The persons who had assembled around the car, helpless as they were, had to stand by and watch it burn for more than an hour. An undertaker says the bodies were blackened and charred beyond recognition. He also says the face of the smallest child was burned less than the others, though one hand was entirely burned off. Mr.

Colovos' face was entirely destroyed. The wife and children could only be identified by the size of the charred remains. The embalmer said when he got there about 1:45 a. m. the car was still in a mass of flames. He could not distinguish the bodies until the fire had died down. They were all in the rear of the car. "I would say they were all burned alike."

A nephew of Mr. Colovos came as quickly as he could after receiving information of the accident. When he got there the car was in flames, and he could see no one in it. He said, "Everything was still in the car." Later, he saw Mrs. Colovos burned to a crisp. She was in the back leaning over the front seat. Mr. Colovos was on the rear seat with one girl under his arm and the other girl on his other side, both charred. He could recognize his uncle though he was badly burned, but could not recognize the girls until they were laid out. His uncle's legs and hands were burned off, his head burned, but his body not so much. Even if appellants' contention is conceded that the terrifying cry came from a female, it does not in any wise tend to prove that Colovos was then dead. It only tends to prove that the wife or daughter was then alive. As we see it the evidence of the presence or absence of an outcry from any particular person would be nothing in the way of proof as to which person survived the other or others. It may be that the breaking of the window by Thurman, or the increased flame, caused the one sitting near thereto to cry out. It is probable that an outcry from no one could have been heard until the breaking of the window. It is noted that proof by the appellee related to the conditions of health and strength and resisting power of the parties, and to the probable existence and effect of carbon monoxide. It is sufficient to say that we have concluded after a careful review of all the proof, that the court properly took the case from the jury.

We are of the opinion that the court sitting as chancellor, correctly applied the common-law rule that when two or more persons die in a common disaster the presumption exists that they perished at the same moment, and if issue be raised on this point there must be satisfactory proof to outweigh the presumption. Counsel for appellant insists that the proof adduced presented a submittable issue. The rule we have stated above is well established in other jurisdictions, and as

relating to the subject, particularly wherein proceeds of life policies were in controversy, reference may be made to Watkins v. Home L. & A. Ins. Co., 137 Ark. 207, 208 S. W. 587, 5 A. L. R. 791; McGowin v. Menken, 223 N. Y. 509, 119 N. E. 877, 5 A. L. R. 794, annotated; Fleming v. Grimes, 142 Miss. 522, 107 So. 420, 45 A. L. R. 618, also annotated.

We come now to one question as to proper distribution of the proceeds of the five policies of insurance on the life of Colovos. In four of the policies the right to change the beneficiary was reserved. The other policy was issued to Colovos on September 1, 1926. It named Frazella Colovos as beneficiary with the right to change beneficiary therein reserved. In April, 1934, this policy was sent to the company's home office and while Frazella Colovos was renamed as beneficiary the policy was indorsed: "Right to change beneficiary not reserved." This was an endowment policy, proceeds to be paid to the insured if living on September 1, 1966.

Each of the policies, all of the ordinary type, carried provisions that the amount of the policy should be paid to the beneficiary upon receipt of due proof of the prior death of the insured. It was also provided in all of them, verbatim or in substance: "If any beneficiary dies before the insured, the interest of such beneficiary shall vest in the insured, unless otherwise provided herein." It is argued that the right to the proceeds of the fifth policy had vested in Mrs. Colovos at its delivery.

As to the several policies in which there was reserved the right to change the beneficiaries, it being admitted that no change had been made, it is hardly to be questioned that their proceeds are to be paid to the representative of Colovos, and distributed under our laws of descent and distribution. All text-writers and every opinion we have examined, with the exception of the Watkins Case, supra, hold that where the right to change the beneficiary is reserved, nothing more is vested than a mere contingent right or expectancy; that the beneficiary to become vested with right to the proceeds of a policy must survive the insured, and furnish proof of the prior happening of that contingency upon which that right depends.

Counsel for appellant in support of the contention that the proceeds of all policies should be paid to the

representative of Mrs. Colovos, cited and relies in the main on the Watkins Case, supra, and Hamblin's Adm'x v. Hamblin's Adm'r, 241 Ky. 447, 44 S. W. (2d) 299, 300. In Weisert, etc., v. Muehl, 81 Ky. 336; Hoppins v. Hoppins' Adm'r, 92 Ky. 324, 17 S. W. 864, 13 Ky. Law Rep. 707, the general principle is stated that where the right to change beneficiary was reserved in the policy there was no vesting of any right. There existed nothing more than an expectancy. In these cases and others, there appears a confusion as to the proper construction of the policy where the right to change the beneficiary was not reserved. This confusion may have been due to an unjustified construction of existing statutes. In Conn, etc., v. White, 189 Ky. 185, 224 S. W. 764, 765, in considering the question as to whether sections 654, 655 Ky. Stats., modified rulings theretofore followed, and in the Hamblin case, supra, argument as to the meaning of these statutes seems to have been settled, and the latter opinion distinguishes the case of O'Bryan v. England, 173 Ky. 12, 189 S. W. 1126, which was also relied on by appellant. In that case (Hamblin case) the court held that where there existed an automatic change of beneficiary, in case of death of the first beneficiary before the insured, there is no vested interest in the proceeds of the policy. While expressing some difficulty in grasping the contention of counsel, the court had no difficulty in placing a proper construction upon the applicable sections of the statute, saying:

> "Each of them deals with vested insurance and which was not divested through the operation of any provisions of the policy, or by any provision contained in any charter or by-law of the company, or by virtue of a statute in effect when the policy was procured. In such a case the beneficial right to the proceeds of the policy remains with the named beneficiary and becomes a part of his property and descends to his heirs * * * although he should die before the insured."

The court then proceeds to say that in the O'Bryan Case and others cited, the policies did not shift the beneficiary, in case the one named in the policy die prior to the death of the insured, as the policy provided in the instant case. See Kash's Ex'r v. Kash, 260 Ky. 508, 86 S. W. (2d) 273.

The case just noted seems to us to be a better au-

thority for appellee's position than for appellants, since the court after mentioning the effect of shifting beneficiaries, said:

"If that be true, and it undoubtedly is, then it was equally competent for the immediate parties to this * * * contract to stipulate that the interest of the named beneficiary in the policy should likewise be contingent upon her outliving the insured. * * * The beneficiary in this case had no vested interest, since it was made contingent upon the happening of either of the two events above named, one of which * * * happened."

One of the leading cases in other jurisdictions is McGowin, Adm'r, v. Menken, supra. There both the insured and beneficiary lost their lives at sea when the Lusitania went down. The wife was the beneficiary and the provisions of the policy were as in these policies, particularly with respect of the payment to the estate of the insured in case of the prior death of the beneficiary. It was held there that survivorship was a condition precedent to the beneficiaries taking the proceeds of the policy. "All she had was an expectancy, subject to be defeated by the assured's designating another beneficiary or failure on her part to survive him."

In notes to this case in 5 A. L. R. 797, it is stated that the great weight of authority is with the ruling in the McGowin Case, and numerous ones are cited in support. The one exception, Watkins v. Home Life, etc., Ins. Co., supra, is noted, as is also the difference in the wording of the policies considered, which it is said might have been ground for the conclusion of the Watkins Case. In the Menken Case the annotator points out that the Watkins Case "is not supported by any decision reported up to this time." A cursory review of many cases decided since then fails to show that the principle laid down therein, i. e., that the beneficiary had such an interest in the policy that in order to defeat same, the burden was on the representative of the insured to prove the beneficiary to have died within the lifetime of the insured, has been followed. The only prior case upholding the ruling to any extent is Cowman v. Rogers, 73 Md. 403, 21 A. 64, 10 L. R. A. 550, which is also discussed and differentiated in notes to the Menken Case. In the Menken Case there are noted, along with others, and fully in accord, Middeke v. Balder, 198

Ill. 590, 64 N. E. 1002, 59 L. R. A. 653, 92 Am. St. Rep. 284; Fuller v. Linzee, 135 Mass. 468; Dunn v. New Amsterdam Casualty Company, 141 App. Div. 478, 126 N. Y. S. 229; Paden v. Briscoe, 81 Tex. 563, 17 S. W. 42.

A later case is Fleming v. Grimes, 142 Miss. 522, 107 So. 420, 422, 45 A. L. R. 618. Here a husband, wife, and child lost their lives in a tornado. The proceeds of a policy were to be paid, half to the wife and half to the daughter. The court found that they had died synchronously. The right to change beneficiaries had been reserved. Another provision of the policy with respect to disposition of the proceeds in case of prior death of the beneficiaries was that they should vest in the insured. The court held that the rights of the beneficiaries to the proceeds were contingent and personal, and did not become vested where the insured and the beneficiaries died at the same moment. The court refused to consider the Watkins Case, supra as authority, saying that the ruling of the court "was contrary to the rule as announced by a great majority of the courts of America and is out of line with what few cases have been referred to from our own jurisdiction, and we prefer to follow that rule and the majority rule." In the application of the law thus declared to be uniform with the one exception, we are unable to see the distinction undertaken to be made between the first four policies and fifth above described. The trial court in holding that the proceeds of the fifth policy should go to the representatives of the insured, pointed out the distinction between what may be called "vested rights" in a policy and "vested rights" in the proceeds thereof. We think he properly concluded that section 655, Ky. Stats., as construed in the Hamblin Case, supra, had relation only to vested proceeds, the right to which might not be divested by the terms of the policy. The court conceded that where a policy does not reserve the beneficiary change provision, and does not contain the other mentioned provisions as in the policies in question, "then there is a vested interest."

However, the court points to that clause of the fifth policy, which provides that the insurer will pay $5,000 to the insured if living on September 1, 1966, "or to the wife, beneficiary, upon due proof of the prior death of insured" and to clause 2, which provides:

"If any beneficiary shall die before the insured, the

interest of such beneficiary shall vest in the insured. * * *,''

The court said, and we agree:

"Although the insured did not reserve the right of change * * * yet the beneficiary did not take a vested interest, for the terms of the policy provided that it was payable to the insured if living September 1, 1966, and further that if the beneficiary died before the insured, the proceeds should be payable to his estate."

It is no argument to say that the insured in the order of nature might not live until the period fixed for the maturity of the endowment. The rule would be the same as though the date had been fixed in 1938. It remains that there was by reason of this provision, no indefeasible vesting of the proceeds of the policy. No one would dispute that at any time the beneficiary could waive the nonreserved right to change the beneficiary, or to allow the insured to pledge or assign the policy. It has been held by this court and many others that without the consent of the beneficiary the insured could do neither of the things above mentioned, because the beneficiary had a vested interest in the policy. But this vested interest is not a pure indefeasible right or interest to the proceeds of the policy, that is, a right which may not be defeated upon the happening of contingencies. In Carpenter v. Severin, 201 Iowa, 969, 204 N. W. 448, 450, 43 A. L. R. 1340, the husband and wife had made wills devising their property to each other. They died in a common disaster. Controversy arose as to whether the disposition of the proceeds of insurance was controlled by the will or by the terms of the policy. The court said:

"In cases of this character, the wording of the policy is controlling, and it is generally obvious in such cases that the object of the insured in taking out the policy, and in designating an alternative beneficiary, was to provide for some dependent, and the courts endeavor to read the contract so as to respect the intention of the insured. Paden v. Briscoe, 81 Tex. 563, 17 S. W. 42; Southwell v. Gray, 35 Misc. 740, 72 N. Y. S. 342. Some courts, in determining the burden of proof, place emphasis on the question whether or not the beneficiary's right is a vested one. [Citing cases.] A vested right, how-

ever, means nothing more than [that] it is beyond the power of the insured or the insurer to deprive the beneficiary of it, but it does not mean that he can assert a claim otherwise than in accordance with the terms prescribed in the policy; nor does the vested character of the right dispense with the necessity of proof on the part of the beneficiary of any condition which the insured stipulated should happen before the beneficiary could obtain the proceeds.''

Dunn v. New Amsterdam Casualty Company, 141 App. Div. 478, 126 N. Y. S. 229, is a case where the assured and the beneficiary perished in what is known as the ''Slocum'' disaster. The opinion is an able one, and upholds our views here.

In McCleery v. Woodmen of the World, 136 Or. 407, 297 P. 345, 299 P. 1004, 1005, the court said:

"A right is vested when there is an ascertained person with a present right to present or future enjoyment; it is 'expectant' when it depends on the continuation of existing circumstances, such as the right of an heir to inherit, provided he survives his ancestor and the ancestor dies seized and intestate; and finally, a right is 'contingent' when it depends on the performance of some condition or the happening of some event before some other event or condition happens. * * * The right [here] was contingent since it depended on the continuation of existing circumstances, namely payment of assessments * * * and also depended on the prior death of the insured.''

See, also, Fidelity & Columbia Trust Company v. Tiffany, 202 Ky. 618, 260 S. W. 357; Mahoney v. Mahoney, 98 Conn. 525, 120 A. 342; Post v. Bailey, 110 W. Va. 504, 159 S. E. 524.

It seems to us the court properly followed the law as laid down in the cases cited and in applying it to each of the policies. We concur in his opinion that the proceeds of all the questioned policies should remain in the hands of the administrator of Mr. Colovos' estate, and by it distributed as is provided by law.

This brings us to a discussion of the final contention of appellant, which is that the A. Colovos estate should bear the funeral expenses of the mother and

daughters. There was one funeral service for all. The funeral director rendered accounts against the four separate estates. The total was $2,683.13, which included $580 for a monument and burial lot, about which latter it seems, there is no dispute. Mr. Colovos' administrator asked for advice as to whether the total should be charged to his or to the several estates. The question was submitted on an agreed statement, which was to the effect that all four had died in a common calamity, it being "impossible to ascertain which member of the family died first. * * *" The court held that "while this obligation does not exist as a debt against his estate after death, nevertheless if the father during his lifetime was obligated to pay for the funeral expenses of his wife and children, then such claims may be asserted against his estate after his death." The court further found as a matter of law that the burden was on those contesting the payment to show that the father did not survive the wife and children. The heirs of Colovos are here on cross-appeal.

It is true the wife had sufficient property, and the children a trifle more than enough estate to pay their funeral expenses. But if such had not been the case, would these unfortunates have been relegated to the ignominy of being buried at the expense of the public? The answer is obvious. An interesting case on the subject is Palmer v. Turner, 241 Ky. 322, 326, 43 S. W. (2d) 1017, wherein we held that the husband, both at common law and by statutes, was liable for "necessaries" to be supplied the wife. In construing sections 2127, 2128, and 2130, Ky. Stats. 1936 Ed., we held that since the word "necessaries" was not defined in the statutes, it should be given its common-law meaning and therefore to include funeral expenses. What is said therein is applicable to the father's infant children, since it was by common law, and is so by statute required that the father shall furnish them necessaries. This conclusion is supported by the reasoning of many authorities.

In Weinstein v. Lotsoff, 232 Ill. App. 566, it is held that a husband was liable for the funeral expenses of his wife, though they had been living apart, and the separation was solely the wife's fault. "The obligation of the husband's liability being based on the common ground of decency, which is broader than his duty to furnish her with necessities." In Seybold v. Morgan, 43 Ill. App. 39, and in Gustin v. Bryden, 205 Ill. App.

204, it was held that funeral expenses for the wife is a liability of the husband, and in the Gustin Case it was expressly held that the married woman's act, and the statute classifying claims for funeral expenses as preferred claims against her estate, did not relieve the husband of his common-law liability to pay the wife's funeral expenses. "In this character of cases the husband, first of all, because he is nearest to her is charged with the duty of the burial of his deceased wife." Toppin v. Moriarty, 59 N. J. Eq. 115, 44 A. 469. In Butterworth & Sons v. Teale, 54 Wash. 14, 102 P. 768, 769, 18 Ann. Cas. 854, the court said:

> "The duty of the husband to defray the funeral expenses of the wife grew out of the obligation of the husband to furnish the wife with the necessaries of life [Palmer v. Turner, supra], while in others it is based on the ground of duty arising from the relation of the parties."

In Sears v. Giddey, 41 Mich. 590, 2 N. W. 917, 918, 32 Am. Rep. 168, the court said:

> "A funeral cannot be delayed for judicial inquiries to determine upon whom the moral obligation to proceed with it [the burial] rests most heavily. Nor if husband and son quarrel about the expense over the grave of the wife and mother, can the undertaker be compelled to await a judicial adjustment of their dispute. The husband being liable to him, he need look no further."

In Sullivan v. Horner, 41 N. J. Eq. 299, 7 A. 411, Stoll, his wife, and child were killed in a railroad collision in Texas. Their home was in Mattewan, N. J., to which place the bodies were taken for burial. The cost of burial expenses, including a surgeon's bill for "rendering the head of the child presentable to view, the cemetery lot, monument, the movement of the bodies to the home, totaled—$1,767.95." Sullivan was a judgment creditor of Stoll to the amount of $1,980. The main issue was whether or not the funeral expenses constituted a preferred claim. The court held the claim to be preferred, saying, "An executor is bound to provide for his testator decent and appropriate Christian burial." After citing many cases holding that the common law obliges the husband and father to furnish necessities of life to the wife and children, these to include burial expenses, the court said:

"The dictates of humanity, no less than the decencies of enlightened society, demand that the reasonable funeral expenses, and the physician's bill * * * be preferred in payment to all other claims or debts. The same considerations apply in this case to the reasonable funeral expenses of the wife and child of the decedent. He and they were deprived of life by the same fatal stroke, and were buried with one and the same funeral. Had he survived them, it would have been his duty to bury his wife and child, and the law would have required it at his hands. This duty, which he was thus unable to discharge, the law, under the circumstances, charges upon his estate. * * * It is true, the statute, in the provision for the payment of funeral expenses, contemplates the expenses of the funeral of the decedent debtor, but an enlightened construction would hold that the provision is broad enough to embrace, in an exceptional case, such as this, the reasonable funeral expenses of the wife and child in that of the * * * father.''

The holding of the court below on the ground that the burden was on the opposition to establish the prior death of the husband finds some support in Weinstein v. Lotsoff, supra. However, we have no hesitancy in concluding that in this particular case, where all the family died together, at the same instant, the expense of the funerals is a just claim against the Colovos estate.

The conclusions above expressed lead us to hold that the chancellor correctly decided both vexatious questions propounded and we therefore affirm the judgment both on the original and cross-appeal.