**COMMONWEALTH of Kentucky, DEPART-MENT OF CHILD WEL-FARE, Appellant,**

v.

**Richard O. JARBOE and Lula Mae Jarboe, his Wife, et al., Appellees.**

Court of Appeals of Kentucky.

Jan. 15, 1971.

As Modified on Denial of Rehearing March 26, 1971.

Lynn T. Mitchell, Dept. of Child Welfare, Frankfort, for appellant.

Lucien T. Wilcox, Homer Parrent, Jr., Garland R. Hubbard, Louisville, for appellees.

OSBORNE, Judge.

This is a proceeding by Richard O. Jarboe and his wife, Lula Mae Jarboe, to adopt Michael Lee St. John. The circuit court entered an order permitting the adoption. We reverse.

The facts of the case are lengthy and novel. Because of the nature of the proceeding, they will have to be stated in full.

On December 8, 1967, the Department of Child Welfare of the Commonwealth of Kentucky entered into a written contract with Richard O. Jarboe and his wife, Lula Mae Jarboe, providing that Mr. and Mrs. Jarboe would take into their home an infant by the name of Michael Lee St. John and there care for him. In consideration for this agreement the Department was to pay Mr. and Mrs. Jarboe $2.00 a day as long as the infant remained in their home and was to reimburse them for any medical care or clothing or any other incidental expenses as provided by the regulations of the Kentucky Department of Child Welfare. The contract provided specifically:

"–that this child and/or children is placed in our home for the purpose of receiving foster care, but not for the purpose of adoption, understanding and agreeing that legal custody shall remain at all times with the Department of Child Welfare and that we will not make independent plans for this child and/or children with parents or anyone else, or take any action toward adopting, or give this child and/or children up to any person other than a worker from the Department of Child Welfare, to whom we agree to give him when requested; * * * "

At the time this agreement was executed Michael Lee St. John was approximately three months of age. He had been committed to the Deparment of Child Welfare by an order of the Jefferson Juvenile Court on September 26, 1967, wherein he was adjudged to be a dependent child. The contract entered into between the Jarboes and the Department is commonly referred to as a foster-parent or boarding-home contract. It is a form contract used by the Department and executed by those persons who board children who are in the custody of the Department. At the time Michael was placed in the Jarboe home the Department had not received a termination of the parental rights of Michael's parents, therefore, they could not consent to his adoption. Sometime after the child had been placed in the Jarboe home, the welfare worker supervising the case noticed that the Jarboes were becoming somewhat attached to the child. She advised her immediate supervisor of this fact and it was determined that the child should be moved from the home.

On November 25, 1968, during a visit, Mrs. Cook, the welfare worker, advised the Jarboes that Mike would be picked up on the following day and moved to another foster home. On the same day, November 25, 1968, the Jarboes instituted proceedings in the Jefferson Circuit Court to adopt the child. They secured from that court an injunction prohibiting the Department from moving the child from their home. Following a lengthy hearing in which the Chancellor heard the Jarboes and considered certain letters and exhibits filed by them along with the personnel from the Welfare Department, he granted the adoption. No transcript was made of the evidence heard by the Chancellor, however, a narrative statement was filed by the appellant Department of Child Welfare and no objections or corrections were made by the appellees Jarboes. However, the Chancellor did make several additions to the narrative statement to which there were no objections by either party. Therefore, we conclude that the record now before us is complete.

The Department in its answer to the Jarboes' petition for adoption filed on March 21, 1969, gives the status of the

child, states that the child's parents' rights were terminated by the court on February 10, 1969; that the child is a ward of the Department and had been placed in the home of the plaintiffs on a boarding-home basis; that the home of the plaintiffs had not been selected by the Department as the proper adoptive home for the infant and the Department was of the opinion that a better and more suitable home could be found. The Department filed as a part of its answer the report of the welfare worker as required by KRS 199.510 and prayed that the petition be dismissed and that the restraining order against the Department be dissolved and requested the court to allow the Department of Welfare to remove the child in question from the home of the plaintiffs.

The report of the welfare worker is signed by Mrs. Jane Anderson. It is four pages long, too long to be set out in this opinion in toto, however, we will attempt to summarize it. It recites first the facts about the child's birth, his parents and grandparents. It then deals with the petitioners, Mr. and Mrs. Jarboe. Mr. Jarboe was born January 22, 1918, completed the eighth grade in school, worked for 23 years as a civilian employee for the Quartermaster depot at Ft. Knox. He retired in 1963 due to high blood pressure and entered the real estate business. At present, he is employed in a liquor store in which he owns one-half interest. Mrs. Jarboe was born on October 29, 1917. She completed the seventh grade in school, has worked outside the home as a baby sitter and at present both the Jarboes enjoy relatively good health. They were first married on October 10, 1936, in Peoria, Illinois, and were divorced on March 22, 1965, in Louisville and remarried on March 25, 1966, in Jeffersonville, Indiana. The divorce was granted to Mr. Jarboe on the grounds of mental cruelty. They are the parents of six children ranging in age from 17 to 31 years. They have 14 grandchildren.

In discussing the divorce with the welfare worker Mrs. Jarboe reminded the worker they had previously applied in 1964 to the Department to adopt a child; that the Department had not at that time approved them for adoption and commenting on this Mrs. Jarboe said, "If you had given us the child then, we probably would not have obtained the divorce." It was the conclusion of the welfare worker that this statement by Mrs. Jarboe presented a motivation for adoption which the welfare worker did not completely approve of. The welfare worker was of the opinion that the Jarboes had some unresolved emotional problems and she recommended that they consult Dr. Joseph Brill, a Department psychiatrist, for an interview. The report recites that the couple visited Dr. Brill. He administered the MMPI test (Minnesota Multiphastic Personality Inventory). The report indicates that the test confirmed the worker's supposition that Mrs. Jarboe had hidden emotional tensions that were not resolved. The report further indicates that the references given by the Jarboes, such as clergy, credit, physicians and personal were consulted. All of them gave favorable reports concerning the Jarboes' standing in the community. The Jarboes' six children were consulted by the welfare worker. There was mixed reaction by the children to the adoption.

The report concludes with this paragraph: "Therefore, it is the recommendation of the Department of Child Welfare, Commonwealth of Kentucky, that the above-named adoption not be granted and the restraining order be lifted."

The testimony in court offered by Mr. and Mrs. Jarboe was to the effect that the child was well adjusted and happy; that they were financially able to support him and that it was to the best interest of the child that he be left in their home. This was supported by letters from doctors, clergy and laymen. Several photographs of the child, some taken with the Jarboes, were filed.

Testimony on behalf of the Department was as follows: Jane Anderson, child wel-

fare worker, first testified to the facts of placing the child in the home which have previously been recited. She stated that the child's adjustment to the home was satisfactory, however, she had visited the home several times and noticed there was a lack of warmth between the Jarboes as marriage partners. She stated that she was of the opinion the Jarboes were withholding information and had unresolved problems between them in their marriage. She testified that in her professional opinion the age of the Jarboes as far as adoption was concerned was a negative factor and that the Department would not place a young child in a home of parents of this age. She testified that in her opinion the child would be better served in another adoptive home with younger parents.

The next witness called by the Department was Dr. Joseph Brill. His testimony was that he was a consultant psychiatrist for the Department on a contract basis; that he had administered the MMPI test to them and found them to be guarded in their expressions and in his opinion they lacked openness of their expression concerning their earlier marital difficulties and were concealing some hidden emotions; and that Mrs. Jarboe was concealing more than Mr. Jarboe. It was his opinion that they should not be recommended as adoptive parents.

The Department called Sherry Inabinet. She testified that she was supervisor of the adoptions unit in the Louisville office of child welfare; that she was Mrs. Anderson's supervisor; that she had consulted with Mrs. Anderson and read her reports and that she concurred with Mrs. Anderson's findings that the Jarboes should not be allowed to adopt Mike because of their age, there being too great a span beween the adoptive parent and the child. This will increasingly cause trouble as the child grows older and will greatly decrease parental participation in the activities of the child. She pointed out that the Jarboes would be 65 years of age when Mike reaches 15. She testified that in her opinion Mike would readily adapt to an adoptive home

and that the change from the foster home to the adoptive home would not be a great problem.

Mr. Fred Downing testified for the Department of Child Welfare stating that he is the adoption consultant for the Department and that at the present time the Department had approximately 225 approved adoptive homes available and that in his opinion 35 of these homes were suitable for Mike and were superior to the Jarboe home for this child. There was other evidence in the record which we have not detailed indicating that the Jarboes may have a drinking problem and that this problem might have been serious and a factor at the time of the divorce.

■ It appears from the Chancellor's findings of fact and conclusions of law that he concluded that this child was being properly taken care of at the present time and that it would be a shock to him to move him out of this home now after his having been there for three years. He, therefore, overrode the objections of the Department of Child Welfare and permitted the adoption notwithstanding the objections. It is the contention of the Department that the court could not properly authorize the adoption without the consent of the Department of Welfare unless the Department was acting arbitrarily and unreasonably. We believe this position to be sound. For this reason, we have recited the contents of the record in great detail.

■ This most sensitive field of the law dealing with the care and placement of children in adoptive homes is one that is peculiarly within the jurisdiction of the legislature. It is a field of law that is susceptible to public policy. It is the legislature that reflects this policy. KRS 199.470(4) provides:

"(4) No petition for adoption shall be filed unless prior to the filing of the petition the child sought to be adopted has been placed *for adoption* by a licensed child-placing institution or agency or by

the department, or the child has been placed with written approval of the commissioner; but no such approval shall be necessary in the case of:

(a) A child sought to be adopted by a stepparent, grandparent, sister, brother, aunt or uncle;

(b) A child received by the proposed adopting parent or parents from an agency without this state with the written consent of the commissioner." (Emphasis added).

It will be noted that the above act requires that before the child can be adopted it must have been placed in the home *for the purpose of adoption.* It is therefore abundantly clear that the legislative policy of this state is that no child except as set out in subsections (a) and (b) of the above statute is to be adopted unless it is first placed in the home for that purpose by the Department of Child Welfare.

■ Had the Department made a motion to dismiss Mr. and Mrs. Jarboes' complaint it is our opinion the trial court would have had no alternative but to dismiss the action. Bedinger v. Graybill's Executor & Trustee, Ky., 302 S.W.2d 594 (1957). There is considerable doubt that the Department could validly waive this statutory requirement. However, it could redesignate the character of the placement to bring it within the provisions of the statute. Due to the fact they filed no motion to dismiss and specifically requested in their brief that this case be considered upon its merits and because of the seriousness of the questions presented, we have decided to consider the merits of the case. The fact that the Department did not make a motion to dismiss does not in any way abrogate the legislative intent found in KRS 199.470 and will not permit the court to thwart that intent. The general rule covering this proposition is stated in 2 Am.Jur.2d, Adoption, § 39, p. 891, as follows:

"Under many adoption statutes when a child has been placed in a foundling hospital, orphan asylum, or child-care agency, consent of the institution is essential to the validity of a decree of adoption of the child. While it has been held that a court does not have jurisdiction to grant a decree of adoption without the consent of the institution to whose guardianship the child was committed, a petition for adoption may be granted notwithstanding refusal of consent by the state board having control of the child where such consent is unreasonably withheld."

■ This court has previously held under a former statute that a court may properly authorize an adoption without the consent of the Department where that consent is unreasonably or arbitrarily withheld. See McKinney v. Quertermous, 306 Ky. 169, 206 S.W.2d 473. We have also held that the Department cannot be forced to approve an adoption unless the withholding of the approval is arbitrary or unreasonable. See Lewis v. Louisville and Jefferson County Children's Home, 309 Ky. 655, 218 S.W.2d 683. It would thus appear that a trial court could not properly allow the adoption without the permission of the Department unless that permission was arbitrarily or unreasonably withheld. We have examined the evidence in this case and are unable to say that the refusal of the Department to approve this adoption was either arbitrary or unreasonable.

There appears to be much more at stake in this case than at first meets the eye. The integrity of our entire system for handling adoptions has been challenged by Mr. and Mrs. Jarboe. First, they violated the boarding-home contract. Second, they attempt to adopt a child without complying with KRS 199.470. Third, they would have a court determine that their facts, conclusions and philosophies are correct as opposed to all the professionals who are in the pay of the state to carry out the state policy. The judicial branch is only one

branch of the government. It must respect the actions of the other branches when they are performing with good faith in a field that is peculiarly within their knowledge and experience.

Jane Anderson who testified for the Department has a B.A. degree from Richmond University, Richmond, Virginia, with a major in psychology and a minor in sociology.

Joseph D. Brill is a psychiatrist with the Southern Indiana Mental Health Clinic, Jeffersonville, Indiana, a consultant to the Department of Child Welfare on a contract basis. He received his M.D. degree from the University of Louisville and specialized in psychiatrics at the University of Louisville. He was certified by the American Board of Psychiatry and Neurology in 1967.

Sherry Inabinet is a supervisor of adoption for the Louisville office of the Department of Child Welfare. She has a B.S. degree from the University of Tennessee in psychology and sociology with emphasis in social work. She has a Master of Science degree in social work from Kent School of Social Work in Louisville, Kentucky.

Fred Downing is an adoptive consultant for the Department of Child Welfare. He received an A.B. degree from Transylvania College and attended the Kent School of Social Work in Louisville, Kentucky. He has attended many seminars on the subject of adoption, one in Pittsburgh, Pennsylvania, as late as March, 1969, conducted by the Child Welfare League of America. All of the above talent is being paid for by the taxpayers of Kentucky at the cost of many thousands of dollars per month. Its sole purpose is to aid and direct the lives of children like Michael Lee St. John. This court or no court should thwart or interfere with the activities of these people without strong cause. To do so is to destroy a force employed and paid for by the citizens and taxpayers. For the foregoing reasons we are of the opinion the Chancellor should not have permitted the adoption.

Judgment reversed.

MILLIKEN, C. J., and PALMORE and STEINFELD, JJ., concur.

HILL, NEIKIRK and REED, JJ., dissent.

EDWARD P. HILL, Jr., Judge (dissenting).

I respectfully dissent from the able and well-written opinion of the majority. I heartily agree with the basic philosophy of the majority opinion, but not in the result reached. My dissent is based upon two propositions.

First, I construe KRS 199.470(4) as being for the benefit of the Department of Child Welfare and that the Department has a right to waive the provisions of this statute. By failing to move for the dismissal of the petition for adoption, the Department waived its right under this statute and the right of the appellees to petition for adoption of the child involved. In the meantime, the child has formed his attachments, decided who are his loved ones, and established his home. We are all agreed that the well-being of the child should be paramount in all adoption proceedings as it is in all other areas concerning the custody of children. Suppose this litigation had been drawn out for five years. It is easy to understand the trauma of a judgment uprooting a child from the only place he can call his home and taking him away from the only people whom he knows as his father and mother. Of less significance is the grief of those who are seeking to adopt. We are not dealing in this case with a chattel, but with a living human being. I would say the statute above referred to is a valid statute, but that the appellant waived its provision.

The second area in which I vigorously dissent concerns the weight to be given by

the chancellor to reports and recommendations by the Department of Child Welfare. This court decided in McKinney v. Quertermous, 306 Ky. 169, 206 S.W.2d 473, that the recommendation of the Department of Child Welfare must be accepted by the chancellor in adoption proceedings unless the Department acted arbitrarily. It is my opinion that the recommendation of the Department should have great weight before the chancellor. To hold that the chancellor *must* accept the recommendation of the Department is to say that the chancellor is nothing more than a ministerial officer or a bookkeeper for the Department. The burden of proof of arbitrariness which is cast upon the party seeking adoption is in these circumstances tantamount to making the Department's findings conclusive. The Department and its workers conduct their investigations in private and in the absence of the party seeking adoption. No one is there to represent the petitioner or cross-examine the source of information. The reports of the Department are usually a summarization of a private investigation. Furthermore, a large number of case workers in the Department of Child Welfare have no legal training.

It is difficult for me to comprehend the process of reasoning by which the majority reaches the result herein, with reference to the weight to be given by the courts to the report of the Department of Child Welfare, when the majority opinion is laid side by side with the very recent opinion in Warner v. Ward, Ky., 401 S.W.2d 62 (1966), wherein it was written by one of the majority in the present opinion that: "The reliability of the report is a matter within the competence of a qualified trial judge to weigh and determine."

Under the majority opinion in the instant case, the trial judge had nothing to "weigh and determine." He must follow the report as if it were a solemn edict from the Grand Potentate of the Universe. The only instance in which the trial judge may disregard the report is where the report is arbitrary. Before he may resolve the question of arbitrariness, the party objecting to the report must attack it and raise the issue of arbitrariness and a long, drawn-out hearing on this question will naturally follow. Certainly we would not anticipate that the report would ever show arbitrariness on its face. It seems to me that the majority should have the judicial fortitude to overrule Warner v. Ward, supra, or at least try to make an effort to distinguish it, which I do not think can be accomplished.

The chancellor in the present case found as a matter of fact, based upon ample evidence, that the petitioners are suitable and qualified for the adoption, and I cannot see that his conclusions were clearly or at all erroneous. In fact, they were correct. I would sustain the chancellor in approving the adoption in this case.

NEIKIRK and REED, JJ., join in this dissent.