**804**

**S.J.L.S., Appellant,**

v.

**T.L.S., Appellee.**

and

**S.J.L.S., Appellant,**

v.

**T.L.S., Appellee.**

Nos. 2006–CA–001730–ME, 2006–CA–001731–MR.

Court of Appeals of Kentucky.

Sept. 12, 2008.

W. Waverley Townes, Kelsey A. Colvin, Louisville, KY, for appellant.

Mitchell A. Charney, Stephanie L. Morgan–White, Louisville, KY, for appellee.

Before ACREE, KELLER, and LAMBERT, Judges.

## OPINION

ACREE, Judge.

In these companion cases, S.J.L.S.[1] (S) appeals the Jefferson Family Court's refusal to set aside a judgment of adoption and a joint custody order, both relating to her biological child, Z.J.S. (Z). For the following reasons, we affirm the family court's order denying Kentucky Rules of Civil Procedure (CR) 60.02 relief in the adoption case, and we reverse the family court's order denying relief in the custody case and remand that case for further proceedings.

## I. Facts and Procedure

Two women, S and T.L.S. (T), met and fell in love sometime in 1997. They soon moved in together. Three years later, they formulated what they referred to as their "long-term plan" to be life partners and to create a family unit. First, S took T's surname by having hers legally changed.

Their plan included raising a child together. They decided that S would be artificially inseminated. T screened potential sperm donors who, in her opinion, embodied traits that reflected her own. S had no part in this selection process. In late 2000, S became pregnant. She gave birth to Z in June 2001.

On August 10, 2001, when Z was only six weeks old, T filed a Verified Petition for Permanent Joint Custody in Jefferson Family Court naming S as respondent. S was not represented by legal counsel. All documents requiring S's signature, including her entry of Appearance and Waiver

(of legal representation), S's affidavit, and the Agreed Order granting the Petition, were prepared by T's attorney.

There is nothing in the entire record indicating any legal basis upon which joint custody was either sought or granted. In fact, as the family court eventually ruled, the parties' circumstances at that time did not support subject matter jurisdiction, much less an order of joint custody. Those circumstances never changed. The pleadings and the Agreed Order simply recite that such an order would be in the "best interest of the child." No hearing was conducted.

On August 16, 2001, the family court judge summarily entered the order tendered by T's counsel based upon, if anything, review of the six-page record. The Agreed Order awarded custody of Z jointly to T and S. Neither party took an appeal from that order.

Notwithstanding the irregularity of the family court's order, and for a time at least, T, S and Z enjoyed the benefits attendant to a familial lifestyle. Sadly, as in too many relationships, the parties' common love for the child was not enough to sustain them as a couple. In May 2003, the romantic relationship between T and S came to an end. S moved out and T and S established separate households.

Still, T had developed and retained an unquestioned and deep affection for Z. Though splitting up was not a part of the parties' "long-term plan," T's adoption of Z was. Six months after T and S split up, and without objection from S, T initiated adoption proceedings.

T's attorney, Trisha Zeller (Zeller), drafted a Petition on T's behalf naming S

1. Consistent with this Court's policy to protect the identity of affected children, we will refer to the parties by their first initials.

and Z as the only parties' respondent. Because Z's paternity had not been established, his biological father was not named as a party. Kentucky Revised Statutes (KRS) 199.490(1)(f). The biological father's identity and rights are not relevant or necessary to these appeals or the underlying actions.

Our Legislature requires that before a petition for adoption is filed by a party who is not related to the child, there must be participation by the Kentucky Cabinet for Families and Children.

> No petition for adoption shall be filed unless prior to the filing of the petition the child sought to be adopted has been placed for adoption by a child-placing institution or agency, or by the cabinet, or the child has been placed with written approval of the secretary [of the Cabinet for Families and Children.]

KRS 199.470(4). However, the statute also provides that "no approval shall be necessary in the case of [a] child sought to be adopted by a stepparent[.]" *Id.* Seizing upon that exception, Zeller claimed that "the Petition is akin to a stepparent adoption" so as to avoid pre-petition Cabinet oversight. Zeller also completed the "Case Data Information Sheet," incorrectly characterizing Z as T's "Step–Son." Without the Cabinet's pre-petition placement or approval of any kind, Zeller filed the Petition on November 18, 2003.

Both KRS 199.510 and the Jefferson Family Court Rules of Procedure (JFRP) [2] also require the Cabinet's post-petition participation. Post-petition participation is initiated by the Jefferson Circuit Clerk when that office sends a copy of every adoption petition to the Cabinet. According to the record, the clerk carried out this duty on the very day Zeller filed the Petition. The same statute also requires the Cabinet to respond to every adoption petition by "investigat[ing] and report[ing] in writing to the court ... not later than ninety (90) days ... after the filing date of the petition[.]" As described in more detail *infra*, the Cabinet also complied with this statutory duty.

The appointment of a guardian *ad litem* to represent Z was unnecessary because Z's biological mother was named as a party defendant. KRS 199.480(3). Nevertheless, simultaneous with the filing of the Petition, Zeller tendered a motion and proposed order seeking such an appointment. On November 25, 2003, the family court appointed Dana Kellerman (Kellerman) as Z's guardian *ad litem.*

There was no activity in the case for nearly two months after the petition was filed, but on January 21, 2004, Zeller filed a motion for a pre-hearing conference and served S's recently engaged counsel, Bryan Gatewood (Gatewood). According to the record, the motion to schedule a pre-hearing conference was never heard, the tendered order for a conference was never signed, and no pre-hearing conference ever took place. Instead, a final adoption hearing was scheduled for 9:00 a.m. on February 18, 2004. Before the hearing, however, Cabinet representatives complied with the Cabinet's duty under KRS 199.510 by sending two separate let-

---

**2.** The JFRP Appendix, entitled Adoption/Termination of Parental Rights, includes the following instructions to Jefferson Family Court Judges and practitioners:

> Make sure there is a Confidential Report *in all cases.* It is often argued that immediate relatives, as set forth in KRS 199.470(4)(a) [including stepparents], are exempted from obtaining a Confidential Report from the Cabinet. KRS 199.470 sets forth the requirements prior to the filing of the petition. It does not address the Cabinet's approval of the adoption after the filing as set forth in KRS 199.510.

JFRP A (emphasis added).

ters to the family court expressing the Cabinet's objection to the adoption.

Bill Nusz, identified by the family court as a Cabinet worker assigned to Jefferson County, sent a letter to the family court stating that T could not legally adopt Z because T and S were not married. While the letter is referenced during a video-taped hearing as having once been a part of the record, it has been missing from the physical file since shortly after it was sent. The videotape transcript shows that at least the family court, the guardian *ad litem*, and T's counsel were aware of Mr. Nusz's letter and its express disapproval of the adoption.

On January 28, 2004, the Cabinet's Assistant Counsel, Jon R. Klein, sent a second letter clarifying the Cabinet's position. He said,

By operation of law, the result of this adoption, if granted, will be that "all legal relationships between the adopted child and the biological parents shall be terminated except the relationship of a

biological parent who is the spouse of the adoptive parent." KRS 199.520(2). Strict compliance with KRS Chapter 199 is required in all adoption proceedings. Failure to do so may result in an invalid judgment.

This letter was addressed to Zeller and copied to the Jefferson Circuit Clerk and Bill Nusz. The copy sent to the clerk was removed from the record before anyone else involved in the case could see it. Only Zeller knew what happened to the Cabinet's written response.[3]

Zeller's litigation strategy reveals that, like the Cabinet, she was aware of the effect of KRS 199.520(2) on S's parental rights. As previously noted, she sought to avoid that effect by claiming legal entitlement to the statute's sole exception that maintains "the relationship of a biological parent who is the spouse of an adoptive parent." KRS 199.520(2). Facing the legal impossibility of T's actual marriage to S, Zeller planned to urge the family court's recognition of the parties' relationship as its equivalent. Representing that Z was

---

**3.** This Court's careful review of the record clearly shows that these two letters were handled inappropriately by someone who had access to this confidential file. There is no reason to believe that any court clerk mishandled these letters. During the October 14, 2005, hearing of S's motion to vacate the judgment, the family court judge acknowledged seeing the letter from Bill Nusz in the file and stated that Kellerman, the guardian *ad litem*, had brought this letter to her attention. The judge was surprised and perplexed that it was no longer in the record and she stated she did not know why it was gone. Zeller, legal counsel for T, stated that she, in fact, did know why it was no longer physically in the record and requested that counsel and the judge agree to adjourn to the judge's chambers so she could be allowed to give the explanation off the record. Waverly Townes (Townes), who by then had substituted as counsel for S, strongly objected and refused to go off the record.

Townes: No ma'am. I'm not going to agree to anything here because I don't like any of this. I don't know what's going on here, but there was nothing in that file in terms of the Cabinet-

Judge: (Interrupting) There isn't now.

The explanation was never presented and the Nusz letter has not since been seen.

The letter from Jon R. Klein, Assistant Counsel to the Cabinet, nearly suffered a similar fate. When Townes and, later, the judge of the family court reviewed the Jefferson Circuit Clerk's physical record in preparation for the October 14, 2005, hearing, the Klein letter was also missing. Prior to its disappearance from the physical record, however, a clerk had scanned it electronically, thereby preserving it in the Jefferson Circuit Clerk's digital archives. When preparing the record for this appeal, the Clerk printed the scanned letter and that copy was placed in the certified record on appeal. It now appears at page 15 of the adoption file. (Jefferson Family Court, 03–AD–500471A).

T's "Step–Son" on the Case Data Information Sheet was also part of that plan.

Revealing her own lack of full confidence that what she was attempting was legally "akin to a stepparent adoption," Zeller undertook a precaution that would be unnecessary in a true stepparent adoption. She prepared an Adoption Agreement providing that "[T's] adoption of [Z] is not intended and in no way terminates the parental rights of [S]." Zeller and Gatewood had their clients sign the agreement only moments before the adoption hearing commenced.

When Gatewood had S sign the Adoption Agreement, he also had her sign a "Voluntary and Informed Consent to Adoption." But the consent was clearly conditional and included language clarifying that

> [S] believes the adoption of [Z by T], *without termination of your Affiant's [S's] parental rights,* to be in the child's best interests and hereby consents *under those circumstances,* as in any stepparent adoption pursuant to KRS 199.520(2). [Emphasis added].

Beyond this precaution, Gatewood revealed his own skepticism of the legality of "stepparent-like" adoption at the February 18, 2004 adoption hearing. Before allowing the family court to grant the adoption, he interrupted to emphasize S's and his own "understanding that my client's parental rights will not be terminated as this is indeed a stepparent adoption." The family court immediately replied, "That's correct and the court also views it that way." (VR No. 1: 2/18/04; 9:01:42 to 9:02:05). Gatewood did not further challenge Zeller's assertion that this was a stepparent adoption despite the fact that he knew T and S were not married.

■ Even though a guardian *ad litem* was unnecessary, once Kellerman was appointed in that capacity, she had a special duty to perform. She was "both a fiduciary and lawyer of the infant, and in a special sense the representative of the court to protect the minor." *Black v. Wiedeman,* 254 S.W.2d 344, 346 (Ky.1953). She was aware of Nusz's disapproval and certainly should have been aware of the unequivocal mandate of KRS 199.520(2) that, to use the Cabinet's wording, "all legal relationship between the adopted child [Kellerman's client, Z,] and the biological parent shall be terminated." Ultimately, Kellerman gave little credence to the Cabinet's opinion or the statute. She expressed no legal opinion of her own regarding the issue, at least none that appeared on the record. Instead, she staked her client's interests on Zeller's representation that pretending T was Z's stepparent made it legally so. More accurately, Kellerman piggybacks her own position on the family court's acceptance of Zeller's theory. As stated in her guardian *ad litem* report, delivered in open court during the adoption hearing itself,

> the court has ruled that this Petition for adoption may be granted pursuant to KRS 199.470 and that the requirements of KRS 199.470(4)(a) have been properly met. Further, the court has found that no Cabinet approval is required to finalize this adoption.

However, when Kellerman prepared and filed her report, these rulings—that this was a stepparent adoption and that Cabinet approval was unnecessary—had not yet been made in this case. Kellerman prepared her report in anticipation of such a ruling[4] perhaps aware that, according to the family court's own subsequent comments on the record, the Jefferson Family

4. We recognize that attorneys, specifically guardians *ad litem* in adoption cases, routinely prepare documents in advance of the hearing and in anticipation of its outcome.

Court had previously granted "stepparent-like" adoptions.[5]

Judges typically deal with tragedy and conflict in their courts, but friendly adoption proceedings present momentary respites—nearly unique opportunities for a judge to deliver joy. The February 18, 2004 adoption hearing was just such an occasion for this judge. Having been convinced that Cabinet approval was not required, the family court disregarded the Cabinet's actual *disapproval* and embraced what Zeller called the "legal fiction" that T was Z's stepparent. The court entered the judgment of adoption specifically finding "this is a stepparent adoption[,]" specifically holding that S's parental rights were not terminated, and ordering that both T and S be "listed on the birth certificate as parents." Z's birth certificate now lists S as his mother and, despite her gender, T is listed as Z's father. Neither party took an appeal from this judgment.

Subsequent to the adoption, the relationship between T and S deteriorated further. They quarreled over visitation and other issues related generally to Z's upbringing and mental health. On June 13, 2005, T filed a motion to increase visitation. S then concluded she needed and hired new counsel, Waverly Townes (Townes), to represent her regarding these custody issues.

Almost immediately, on June 17, 2005, Townes obtained an order allowing him to examine the relevant confidential court files, including the adoption record in this case. On July 13, 2005, after accessing and examining both records, Townes filed CR 60.02 motions seeking vacation of the custody order and of the judgment of adoption on grounds that they were both void *ab initio*. Each motion was supported by a persuasive memorandum that the court lacked subject matter jurisdiction to address either the custody matter or the adoption petition. Zeller filed responses on behalf of T, objecting to the motions on equitable grounds.

A hearing was held on these motions on October 14, 2005, at which the parties' legal arguments were presented and testimony was taken. The family court's statements and demeanor during the hearing suggest the court was inclined to grant the motions. Perhaps because of this, on October 25, 2005, T also hired new legal counsel, attorney Mitchell Charney (Charney).

Townes objected to Charney's motion to substitute as counsel on the ground that he had consulted with Charney in connection with his representation of S, though he admitted he never identified the parties during the discussion. Townes supported his objection with his affidavit stating, among other things, that "Charney agreed ... that the Judgment of Adoption was void *ab initio*."

---

**5.** The ostensible basis of "stepparent-like" adoption comes, in part, from the language of KRS 199.470(4)(a), which states that Cabinet approval for placement of an adoptive child is not required for "[a] child sought to be adopted by a stepparent, grandparent, sister, brother, aunt, uncle, great grandparent, great aunt, or great uncle[.]" This appellation of "stepparent-like" adoption begs the absurd question whether a prospective adoptive parent could avoid participation by the Cabinet by claiming status as "grandparent-like," "sister-like," "brother-like," "aunt-like," etc. In other jurisdictions, the more appropriate and categorically distinct term "second parent adoption" is used. *See, e.g., Sharon S. v. Superior Court,* 31 Cal.4th 417, 2 Cal.Rptr.3d 699, 73 P.3d 554, 558 fn. 2 (Cal.2003)(" '[S]econd-parent adoption' [is] an independent adoption whereby a child born to one partner is adopted by his or her non-biological or non-legal second parent, with the consent of the legal parent, and without changing the latter's rights and responsibilities." Citation omitted.). Currently, there is no statutory authority for "second-parent adoption" in Kentucky as there is in these other jurisdictions.

Charney responded, supported by his own affidavit, that he did not recall the specific conversation, nor could he specifically refute Townes' assertion that the two of them engaged in a non-specific conversation of the nature Townes described. He denied, however, that these events prevented his representation of T. Ultimately the court allowed Charney to substitute as T's counsel. Charney candidly stated by affidavit that he largely agreed with Townes' legal opinion regarding the invalidity of the adoption.

> To be quite honest with the Court, the undersigned probably would have expressed the opinion described by Mr. Townes [that the judgment of adoption was void *ab initio* ] prior to researching the issue. [Now], the undersigned firmly believes that Ky.Rev.Stat. (KRS) 199.540(2) governs this case[.]

The family court first turned to S's motion to set aside the custody order by candidly "acknowledg[ing] erroneously entering the tendered Agreed Order without making an independent judgment as to whether it had the subject matter to do so." (Order Overruling Motion to Set Aside Custody Judgment, p. 6). Specifically, the court found that T could not satisfy any of the jurisdictional prerequisites.

> [T] could not file for joint custody of [Z] under KRS 403.420(4)(a) [6] because [T] was not a parent of [Z]. [T] could not file for joint custody of [Z] under KRS 403.420(4)(b) because [Z] was in the physical custody of one of his [biological] parents [S,] as well as [T]. On August 10, 2001[T] could not file for joint custody of [Z] under KRS 403.420(4)(c) be-

cause [T] had not met the statutory requirements for *de facto* custodian [that the child] has resided with the person claiming *de facto* custodian[ship] for a period of at least **six** months [and Z] was less than two months old.... [Emphasis in original]

(Order Overruling Motion to Set Aside Custody Judgment, p. 4). This correct analysis should have been the family court's initial ruling in response to the custody petition itself.

Turning to the adoption case, the family court again admitted its failure to make an independent judgment regarding subject matter jurisdiction when it mattered most—at the time of the original hearing. Just as it had in the custody matter, the family court also acknowledged that it lacked subject matter jurisdiction when it granted the adoption.

> [T]his Court must respect the Supreme Court's decision [in *Day v. Day*, 937 S.W.2d 717, 719 (Ky.1997) ] that the residency requirement [of KRS 199.470(3) ] is mandatory. [Z] did not reside with [T for] the requisite 90 days prior to filing the petition. Under KRS 199.470, this Court did not have subject matter jurisdiction on February 18, 2004 to enter the Judgment of Adoption. If a Court without jurisdiction enters a judgment, that judgment is void and subject to a collateral attack.

(Order Overruling Motion to Set Aside Judgment of Adoption, pp. 6–7).

However, the family court was convinced by T's counsel's argument that KRS 199.540(2) was an absolute bar to any attack on the judgment of adoption whether collateral or direct, procedural or sub-

---

**6.** Citations to Chapter 403 reference the version of the statute in effect at that time. KRS 403.420, since repealed, was entitled, "Prerequisites to jurisdiction; commencement of proceeding." The jurisdictional aspects of KRS 403.420 have been readdressed by KRS 403.822 to 403.840. KRS 403.270 continues to address "de facto" custodianship as it did during the entirety of this proceeding.

stantive, because more than a year had passed since its entry. Even though the statute did not prevent an attack on the order of joint custody, the survival of the judgment of adoption would have necessitated a subsequent custody order to direct the parties. Consequently, the family court also denied both CR 60.02 motions based on S's "failure to file her motion in a reasonable time; [her] full knowledge of all facts at the time the [custody order and adoption] was entered; and clean hands doctrine."

## II. The Issues

S presents several, well-founded arguments for the invalidity of the joint custody order and the judgment of adoption and, consequently, for reversing the family court's denial of CR 60.02 relief. T's counter-arguments for affirming the family court are strong as well. Between them, we are faced with the following issues.

- Is T the stepparent of Z as indicated in the judgment of adoption?
- Does T's relationship with S and Z present circumstances sufficiently extraordinary as to justify application of the legal fiction that T was Z's stepparent?
- Did the family court properly order the retention of S's parental rights *vis-a-vis* Z contrary to the parental rights termination provision of KRS 199.520(2)?
- May a party waive the parental rights termination provision contained in KRS 199.520(2)?
- Does estoppel apply here to maintain S's parental rights contrary to the parental rights termination provision of KRS 199.520(2)?
- Does the concept of " 'stepparent-like' adoption" exist in harmony with Kentucky's adoption laws?

- Could a valid judgment of adoption be entered in this case without Cabinet consent?
- Is KRS 199.540(2)—the limitations statute relative to adoptions—inapplicable where a judgment of adoption is void *ab initio* because the family court lacked subject matter jurisdiction to enter it?
- If the adoption stands, are S's parental rights terminated as required by KRS 199.520(2)?
- Did the family court properly deny S's CR 60.02 motion in the custody case?

We consider each of these arguments in turn. We answer each in the negative.

## III. T Is Not Z's Stepparent

■ The family court's ruling that "this is a stepparent adoption" presupposes a factual determination that T was, in fact, Z's stepparent. This was clear error. A stepparent is defined by one's indirect *legal* relationship to a child. A stepparent to a child is one, other than a biological or adoptive parent of that child, who marries one of the child's biological or adoptive parents, provided the parental rights of such parent have not been voluntarily or involuntarily terminated. *See also*, Black's Law Dictionary, *parent; stepparent* (8th ed.2004)(defining "stepparent" as "The spouse of one's mother or father by a later marriage."). Stepparent status requires a legal marriage to the child's parent. We do not see how this elemental concept eluded the court below and can only conclude that it was knowingly ignored.

In Procrustean fashion, the lawyers and family court in this case tortured the facts of the relationships among T, S and Z to make them fit the requirements of KRS 199.470(4)(a) and KRS 199.520(2), and then proceeded to cut off the legs upon which such cases stand—the approval of the Cabinet, the very agency delegated by our

**816**

Legislature with authority to carry out its statutes and underlying public policy regarding adoption. *Thomas v. Cabinet for Families & Children,* 57 S.W.3d 262, 268 (Ky.2001). The Cabinet recognized the absence of this legal relationship and warned the family court of the consequences of erroneously holding it existed. The family court disregarded that admonition. Instead, by holding that T was Z's stepparent, the family court elevated the status of the relationship between T and S (who were no longer even cohabiting) to legal marriage.

What occurred here amounted to "reinstituting by judicial fiat common law marriage which by expressed public policy is not recognized. *See* KRS 402.020(3) [now KRS 402.020(1)(c) ]." *Murphy v. Bowen,* 756 S.W.2d 149, 150 (Ky.App.1988). We cannot ignore—and the family court should not have ignored—the fact that the parties' relationship "simply does not exist as a 'marriage' of any kind." *Pendleton v. Pendleton,* 531 S.W.2d 507, 509–10 (Ky. 1976), *vacated and remanded on other grounds,* 431 U.S. 911, 97 S.Ct. 2164, 53 L.Ed.2d 220 (1977), *on remand,* 560 S.W.2d 538 (Ky.1977). Consequently, as a matter of law, their relationship cannot have supported a factual finding that T was Z's stepparent. S is correct that the adoption should not have been initiated pursuant to KRS 199.470(4)(a), or concluded in reliance upon KRS 199.520(2).

**IV. Creation of a "Legal Fiction" that T is Z's Stepparent is Not Warranted**

█ To circumvent the termination of S's parental rights as required by KRS 199.520(2), Zeller convinced the family court to adopt the "legal fiction" that the relationship between T and S is equivalent to *marriage and therefore T, though not legally married to S, was Z's stepparent.*

It is clear that this was an inappropriate use of such a legal device.

█ "Legal fictions" have been frowned upon generally in Kentucky, particularly when they are misused. They have been called "charades," *Earle v. Cobb,* 156 S.W.3d 257, 261 (Ky.2004), and "subterfuge," *Hughes v. Lampman,* 197 S.W.3d 566, 568 (Ky.App.2006), and "disguises." *First State Bank v. Morton,* 146 Ky. 287, 142 S.W. 694, 699 (1912). "[L]egal fictions [are] allowed to operate only in cases where it will promote right and justice." *Burke v. Tartar,* 350 S.W.2d 146, 148 (Ky. 1961) (citation and internal quotation marks omitted). By this we do not mean right and justice in the abstract, but right and justice under the law. That is why a " 'legal fiction,' as it is denominated in the books, cannot be applied in this state ... to abrogate the sections of [any] statute[.]" *Pittsburgh, C., C. & St.L. Ry. Co. v. Bartels,* 108 Ky. 216, 56 S.W. 152, 153, 21 Ky.L.Rptr. 1670 (1900). It should be obvious that this is because use of a legal fiction to abrogate a statute, particularly one that is clear on its face, would violate the doctrine of separation of powers. Only where a statute is clearly ambiguous or where its operation leads to an absurd result, may a court use such legal devices as "legal fictions," and then only for the purpose of carrying out the intent of the Legislature.

Obviously, use of such an artifice would have been unnecessary if only T had lawfully married S before the adoption hearing, thereby becoming Z's lawful stepparent. We know, of course, that the Legislature has expressed the Commonwealth's public policy of prohibiting a variety of marriages.

Marriage is prohibited and void:
(a) With a person who has been adjudged mentally disabled by a court of competent jurisdiction;

(b) Where there is a husband or wife living, from whom the person marrying has not been divorced [bigamy];

(c) When not solemnized or contracted in the presence of an authorized person or society [common law marriage];

(d) Between members of the same sex;

(e) Between more than two (2) persons [polygamy]; and

(f) [With some exception], when at the time of the marriage, the person is under sixteen (16) years of age[.]

KRS 402.020(1), *see also* KRS 402.040(2)("A marriage between members of the same sex is against Kentucky public policy[.]").

T did not challenge the constitutionality [7] or otherwise question the validity of these statutes. T's counsel simply made a passionate plea at the hearing on S's CR 60.02 motions that had been unnecessary at the time the family court granted the adoption.

Zeller: I'd like to say at the outset, it's a very sad day.

Judge: Uh-huh (affirmative response).

Zeller: A sad day not only for the individuals in this courtroom, but for the entire gay community which has benefited from the judges, this honorable court, and other courts, allowing them to have the right to parent together a child. . . . Let's face it. This is a legal fiction because gay couples cannot marry in the state of Kentucky, in the Commonwealth of Kentucky. So, it's a legal fiction . . . to give equal protection, equal rights, to gay couples.

Judge: I think the difference is that at the time, several state supreme courts had interpreted the same statute [8] . . . I think Pennsylvania, Delaware, several others, and had found the best interests of the child, it had the marriage provision in it and they had essentially found sister statutes of ours and our statute had not yet been construed by our Supreme Court and several other supreme courts had. And so, two or three other judges and I had granted ["stepparent-like"] adoptions.

. . . .

But Mr. Townes also points out that I didn't terminate the [parental rights of S as required by KRS 199.520(2) ]

Zeller: (Interrupting) Of course! That's part of the legal fiction that the family court judges who have so graciously given to gay couples these rights, and this is where, this is the sadness of this day; that not only is this young boy who has two parents, two mothers, potentially going to lose one of them, but that gay couples from here on out are potentially going to be blocked.

. . . .

Judge: We judges often get accused of legislating from the bench—

Zeller: Absolutely.

Judge:—and it's—

Zeller: (Interrupting) This is not 1985. . . . This is 2005, and these are real issues where *the legislation hasn't caught up* with many, many people who are in the shadows of what our Christian nation views as family.

---

7. Subsequent to the February 2004 adoption hearing, Ky. Const. § 233A was ratified by the voters and adopted, effective November 2, 2004. The constitutional prohibition reads, in its entirety: "Only a marriage between one man and one woman shall be valid or recognized as a marriage in Kentucky. A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized."

8. As we note *infra,* these foreign courts did not interpret "the same statute."

(VR No. 1: 10/14/05; 15:04:20 to 15:28:04)(Emphasis supplied).

The question then becomes whether Kentucky's prohibition of same-sex marriage, or T's opinion that Kentucky legislation "hasn't caught up", constitutes a circumstance so extraordinary that the family court was justified in creating and applying a "legal fiction" that avoided the effect of KRS 199.520(2), KRS 402.020(1)(d), KRS 402.040(2), and now Section 233A of Kentucky's Constitution. The overwhelmingly obvious answer is no. Without question, it is inappropriate to use a legal fiction to sidestep a public policy so clearly expressed by the Legislature in statute and by the People of the Commonwealth in its ratification of a Constitutional provision.

Further, we conclude that the operation of these statutes does not bring about an objectively absurd result. In such a circumstance, we are bound to give full force and effect to the plain wording of both statutes. *See, e.g., James v. Sevre–Duszynska,* 173 S.W.3d 250, 258 (Ky.App. 2005)(We will make "an exception to the literal language in the present statute to avoid an absurd and unworkable result" but not otherwise.). It is inescapable that we cannot affect the clarity of these statutes by use of a legal fiction. The family court erred by accepting T's argument to that effect.

## V. Impact of Adoption on the Legal Relationship Between S and Z

More distressing to this Court than either the recognition of the parties' relationship as a *de facto* common law marriage, or the legal fictionalization of a stepparent-like status, is the universal failure in this case to properly consider the effect that carrying through with such a ruse could have on the relationship between Z and his biological mother, S. By pretending during the adoption proceeding that T was S's spouse and therefore Z's stepparent, the family court and the parties' original lawyers, including Z's guardian *ad litem,* put at risk Z's only familial relationship legally recognizable in this record—the relationship between himself and the woman who gave birth to him.

Was it proper or lawful for the family court to order the retention of S's parental rights in direct contravention of KRS 199.520(2)? The question answers itself, and the answer, clearly, is no.

The dilemma we face is this. Even if this Court ultimately held that KRS 199.540(2) prohibits an attack on the validity of the *adoption* of Z by T, S's retention of parental rights contrary to KRS 199.520(2) is a separate matter that remains subject to attack. KRS 199.520(2)("Upon granting an adoption, all legal relationship between the adopted child [Z] and the biological parents [S] *shall be terminated* [.]" (Emphasis supplied)). S was not and is not T's spouse and, therefore, she cannot claim to have retained her parental rights *vis-a-vis* Z by virtue of being married to T. The statutory language is clear. Marriage between T and S is the *only legal exception* to a complete and automatic termination of S's parental rights upon the entry of the judgment of adoption.

■ Our Court recently reiterated that, in Kentucky, adoption "envisions a complete breaking off of old ties." *Sluder v. Marple,* 134 S.W.3d 15, 17 (Ky.App.2003) (citation and internal quotes omitted). Such a termination of parental rights "is demanded by public policy." *Id.*

> [T]he Legislature intended that the adoption of a child necessarily brings to an end all connections, legal and personal, with any natural parent. If a child is subject to the parental control of two

families—which are alien and often hostile to each other—the resulting injuries to the child's emotions and future well-being are a matter of deep concern to the public.

*Jouett v. Rhorer*, 339 S.W.2d 865, 868 (Ky. 1960).

■ Since enunciation of public policy is the domain of the Legislature,[9] any desired change in a legislatively expressed public policy must originate there and not with the Judiciary. *Sluder*, 134 S.W.3d at 17; *see also, Morrison v. Carbide & Carbon Chemicals Corp.*, 278 Ky. 746, 129 S.W.2d 547, 549 (1939)("If a change in that policy is desired, application must be made to the Legislature, and not to the judiciary, whose function it is to declare the law, but not to make it."). Specifically with regard to adoption laws, our Supreme Court has made this point crystal clear.

> [A]doption only exists as a right bestowed by statute and, furthermore, … there must be strict compliance with the adoption statutes. The law of adoption is in derogation of the common law. Nothing can be assumed, presumed, or inferred and *what is not found in the statute is a matter for the legislature to supply and not the courts.*

*Day v. Day*, 937 S.W.2d 717, 719 (Ky.1997)(emphasis added). Ironically, it is this very decision that the family court below acknowledged it "must respect."

By what artifice then, and to what end, may this Court sanction grants of adoption by non-spouses and also avoid the operation of KRS 199.520(2)? At the hearing of

S's CR 60.02 motions, Zeller effectively pleaded to the family court that "we have a family here and we beg this court, we beg this court, to continue the recognition of partnership that the court so graciously recognized when the parties came to it." We are not as easily swayed. Zeller's statement is fantastic and intellectually dishonest considering that six months before the parties came to the family court for the adoption, they had already split up and at least one had found a subsequent life partner.

■ Despite our agreeing with the notion "that the more familial bonds a child has is generally better for the child, this court is not in a position to add words and meaning to a statute that is clear on its face. We can only enforce the statute as it is written." *E.D. v. Com., Cabinet for Health and Family Services*, 152 S.W.3d 261, 265 (Ky.App.2004) (citation and quotation marks omitted). Our responsibility is, as the family court's was, to enforce KRS 199.520(2), as it is written, without passion or prejudice. Where it applies, we must do so. We believe it applies here. Therefore, affirming the Judgment of Adoption will mean that if S is to retain her parental rights with regard to Z, that retention must have a legal basis other than the words contained in KRS 199.520(2).

## VI. KRS 199.520(2) Is Not Subject to Waiver

■ Zeller successfully argued below, and T argues before us, that even if the adoption and retention of parental rights is

---

**9.** There is a clear hierarchy in the enunciation of public policy, nowhere better expressed than in *Kentucky State Fair Bd. v. Fowler,* 310 Ky. 607, 221 S.W.2d 435 (1949).

> The public policy of a state is to be found: first, in the Constitution; second, in the Acts of the Legislature; and third, in its Judicial Decisions. Where the Constitution

is silent, the public policy of the State is to be determined by the Legislature on subjects which it has seen fit to speak. It is only where the Constitution and the Statutes are silent on the subject that the Courts have an independent right to declare the public policy.

*Id.* at 439. (Citations omitted).

statutorily incompatible, S waived her right to object to it now. We do not agree.

The adoption and its effect on S's retention of parental rights are inextricably related. Even if we held that S waived her right to object to the adoption, we cannot treat S's reservation of parental rights as a waiver. The subject statute, KRS 199.520(2), does not create a right personal to either party so as to allow its waiver by either of them. *See Gillen v. Illinois Cent. R. Co.*, 137 Ky. 375, 125 S.W. 1047, 1049 (Ky.1910)("[A] party may waive … a statute … enacted for his benefit or protection, where it is exclusively a matter of private right, and no considerations of public policy or morals are involved[.]"); *cf., Gudgel v. Kaelin*, 551 S.W.2d 803, 805–06 (Ky.App.1977)(Borrower cannot waive usury statutes designed to protect public.); *see also*, 31 C.J.S. *Estoppel and Waiver* § 75 (1996)(An individual may not waive a benefit or right conferred by statute where that statute was enacted for the protection of the public or to serve a public purpose.). Allowing the private waiver of a statute "demanded by public policy[,]" *Sluder*, 134 S.W.3d at 17, would undermine the intent of the Legislature in enacting the statute and, further, would undermine the statute's public goals.

We find, as a matter of law, that S cannot waive the public policy-based requirement of KRS 199.520(2) that "[u]pon granting an adoption, all legal relationship between the adopted child and the biological parents shall be terminated[.]"

## VII. Operation of KRS 199.520(2) Is Not Estopped Under These Facts

██ Attorney Zeller urged an estoppel argument to trump the clear invalidity of the adoption and joint custody order. Re-

ciprocally then, will estoppel [10] prevent the automatic termination of S's parental rights as otherwise required by KRS 199.520(2)? We do not see how, and for several reasons.

The family court should have dispensed with the estoppel argument by citation to *Nussbaum v. General Acc., Fire & Life Assur. Corp., Ltd., of Perth, Scotland*, 238 Ky. 348, 38 S.W.2d 1 (Ky.1931). *Nussbaum* holds that "[a]n estoppel too is only available to a person who is h[er]self innocent and mislead [sic] by the other party." *Id.* at 2. Our close examination of the record clearly indicates that S never misled T as to any fact relevant to this case. Nor can S be blamed for misleading T as to the law. Our careful review of the record indicates that whatever degree of guile was exercised here, T exercised it *at least* in equal measure to S.

██ Additionally, where parties enter into an agreement with the intention of avoiding the operation of "clear, legislative requirements, the legal consequences of the statute cannot be avoided by estoppel." *Greenlee v. Rainbow Auction/Realty Co.*, 202 Wis.2d 653, 670, 553 N.W.2d 257, 264 (Wis.App.1996); *see also Louisiana State Troopers Ass'n, Inc. v. Louisiana State Police Retirement Bd.*, 417 So.2d 440, 445 (La.App.1982)("It is well settled that equitable considerations and estoppel cannot be permitted to prevail when in conflict with positive written law."); *accord, Carroll v. City of Philadelphia, Bd. of Pensions and Retirement Mun. Pension Fund*, 735 A.2d 141, 144 (Pa.1999); *Bresnahan v. Bass*, 562 S.W.2d 385, 390–91 (Mo.App.1978). The Kentucky Court of Appeals has embraced that rule and its rationale.

---

**10.** "[T]here is a legal distinction between estoppel and waiver[.]" *Mollick v. Collins*, 252

S.W.2d 665, 668 (Ky.1952).

[I]n dealing with an equitable estoppel argument ... that court reasoned as follows:

... The policy this state shall adopt ... is properly a legislative concern, and the language of the statute is not ambiguous.

We believe any attempt by the courts to judicially amend this statute which is plain on its face would contravene the separation of powers mandated by the Constitution. It follows that equitable estoppel considerations are likewise not applicable[.]

*Renfroe v. Ladd,* 701 S.W.2d 148, 149–50 (Ky.App.1985), *quoting C.G. Campbell & Son, Inc. v. Comdeq Corp.,* 586 S.W.2d 40, 41 (Ky.App.1979)(applying KRS 355.2-201).

■■■ T's estoppel argument is necessarily dependent upon enforcement of the parties' "Adoption Agreement." This agreement includes language specifically designed to avoid operation of KRS 199.520(2). Agreements that run contrary to law, or are designed to avoid the effect of a statute, are illegal. 17A Am.Jur.2d *Contracts* § 239 (1991); *see also Commonwealth v. Whitworth,* 74 S.W.3d 695, 700 (Ky.2002)("[A] contract is void *ab initio* if it seriously offends law or public policy[.]"); *Bustin v. Bustin,* 969 S.W.2d 697, 699 (Ky.1998)(Dissolution agreement cannot "terminate a support obligation in derogation of current statutes."); *State Farm Mut. Auto. Ins. Co. v. Fletcher,* 578 S.W.2d 41, 43 (Ky.1979)(Public policy will not permit a contract to bring about one result when a statute requires the opposite result.). Our courts will not enforce such contracts. *Zeitz v. Foley,* 264 S.W.2d 267, 268 (Ky.1954); *see also, Dodd v. Dodd,* 278 Ky. 662, 129 S.W.2d 166, 169 (1939)("[T]he court *sua sponte* will refuse to enforce a contract against public policy."); *Said v. Lackey,* 731 S.W.2d 7, 8 (Ky.App.1987)("As

the contract [of employment designed to avoid operation of KRS 441.055 and regulations promulgated thereunder] violates statutory law, it will not be enforced.").

■■■ The portion of the Adoption Agreement reserving to S her parental rights is directly contrary to public policy as that policy is identified in *Jouett* and *Sluder, supra,* and therefore cannot be enforced even by estoppel.

[I]f a contract is void because against public policy, or for any other reason, it cannot be given vitality through the operation of an estoppel, which would be but a recognition and enforcement of the void contract through the indirect means of an estoppel when it would not be recognized or enforced without the estoppel.

*Looney v. Elkhorn Land & Improvement Co.,* 195 Ky. 198, 242 S.W. 27, 28 (1922). More directly stated, S could not defend her retention of parental rights by referencing the Adoption Agreement.

[One] cannot shelter himself behind the illegal contract nor can courts clothe with legality a contract that is absolutely illegal and void even by the application of the doctrine of equitable estoppel. If through the application of that doctrine courts can bring about a result expressly forbidden by constitution and statute on the ground of public policy, then estoppel does what public policy and the law has forbidden.

*Tobacco By–Products & Chemical Corp. v. Western Dark Fired Tobacco Growers Ass'n.,* 280 Ky. 469, 133 S.W.2d 723, 726 (1939).

Even if we found that the estoppel doctrine could be "modified by certain exceptional facts[,]" *Forbes v. City of Ashland,* 246 Ky. 669, 55 S.W.2d 917, 921 (1932), the estoppel would operate only as between T and S. *Yocom v. Jackson,* 491 S.W.2d 842,

843 (Ky.1973)("Equitable estoppel cannot operate to bind a stranger."). Though T could not argue she has a superior right to parent Z because S's parental rights were terminated, it is more than questionable whether the estoppel could ever insulate S from claims to the proper operation of the statute by strangers to the adoption proceeding. If T should marry, T's spouse, as a true stepparent contemplated by KRS 199.470(4)(a), would be entitled to petition for Z's adoption arguing that KRS 199.520(2) terminated S's parental rights. Upon S's death, her heirs, including any future children (biological or adopted), would have a strong argument that Z has no right to inherit from S's estate otherwise than by specific bequest or devise. KRS 199.520(2).

We find as a matter of law that the doctrine of estoppel cannot be applied to authorize the retention of parental rights of a biological parent whose child is adopted by a non-spouse. To the extent the family court relied on this doctrine to do so, it erred.

## VIII. "Stepparent-like" Adoption Cannot Exist In Harmony With Kentucky Law.

The parties have used the term "stepparent-like" adoption in this case to mean the adoption of a child by the same-sex partner of that child's biological parent without the termination of the biological parent's parental rights.[11] Philosophically speaking, if "stepparent-like" adoption, as a comprehensive and acceptable extension of Kentucky's adoption laws, could somehow be incorporated into our jurisprudence, the specific operation of KRS 199.520(2) terminating S's parental rights could be avoided. In essence, the family court determined precisely that—that stepparent-like adoption can exist in harmony with our adoption laws, specifically KRS 199.520(2). We disagree.

The family court gave three reasons for granting what it terms a "stepparent-like" adoption. First, the family court noted that it had "entered the Judgment of Adoption as a stepparent like adoption prior to passage of the 2004 constitutional amendment prohibiting recognition of a legal status identical or similar to marriage for unmarried individuals." Second, the court offered that "[a]t the time of the adoption [February 18, 2004], KRS 199.470 had not been interpreted by any Kentucky Appellate Court to prevent a stepparent like adoption for homosexual couples." And third, other states had granted "stepparent-like" adoptions. Whether considered separately or together, these three reasons offer no legal basis for the family court's entry of this judgment of adoption.

The family court defended its grant of the adoption by noting that it was only subsequent to its entry of the judgment that Kentucky passed a constitutional amendment prohibiting marriage between individuals of the same gender. Ky. Const. § 233A. This justification is either disingenuous or uninformed. Such marriages have been prohibited by statute since 1998, KRS 402.020(1)(d), and by common law since the formation of the Commonwealth. *Jones v. Hallahan,* 501 S.W.2d 588, 590 (Ky.1973)("In all cases, however, marriage has *always* been considered as the union of a man and a woman and we have been presented with no authority to the contrary." (Emphasis supplied)); *see also,* KRS 402.040(2)(1998)("A marriage between members of the same sex is against Ken-

---

**11.** We note that the parameters of "stepparent-like" adoption, if permitted, would also authorize the adoption of a child by the heter-osexual partner of that child's biological parent without terminating the biological parent's parental rights.

tucky public policy[.]"). No court had declared either KRS 402.020(1)(d) or KRS 402.040(2) unconstitutional and, therefore, they were entitled to the family court's compliance and application.

The family court's second justification was that no Kentucky appellate court had as yet held that KRS 199.470 did not include "stepparent-like" adoptions for homosexuals.[12] This is an equally disingenuous justification. Stepparent adoption is permitted through the operation of two statutes—KRS 199.470 (allowing any adult resident to adopt) and KRS 199.520(2)(preserving the stepparent's spouse's parental rights). Calling the adoption "stepparent-like" does not eliminate the need to factor in KRS 199.520(2). Nothing prevented T from adopting Z, but nothing short of legislative enactment could prevent the termination of the parental rights of Z's mother if she did.

Finally, the family court determined that "[c]ourts in other states had interpreted statutes similar to Kentucky's statute to allow stepparent like adoptions for homosexual couples." We note first that those courts were not interpreting a uniform act, but their own unique versions of adoption law, attuned specifically to their jurisdiction. We note next that when a court resorts to the laws of foreign jurisdictions to offset the unequivocal language of its own state's statutes, there is a justifiable suspicion that the decision is results-oriented. We note also that while the family court cited cases from five other states as authorizing "stepparent-like" adoption, equally as many and even more states have declined to do so.[13] Finally, all of the cases we examined, including the five cited by the family court, turn on the individual state's public policy as expressed by the respective state legislatures. That is true whether "stepparent-like" and similar adoptions were permitted or rejected. Here, we will address only those cases erroneously relied upon by the family court.

*In re Adoption of R.B.F.*, 569 Pa. 269, 803 A.2d 1195 (2002), cannot fully be understood except in the context of its antecedent, *In re Adoption of E.M.A.*, 487 Pa. 152, 409 A.2d 10 (1979), and the Pennsylvania legislature's response to that decision. In *E.M.A.*, Pennsylvania's high court stated the issue as follows:

12. Such distorted logic brings to mind "the apocryphal story" of a conference of our highest court's judges during which one judge looked at a case cited by another and said, "This case doesn't say that." According to the story, the other judge immediately grabbed up the book and retorted, "Show me where it doesn't say that!" *Ex parte Farley*, 570 S.W.2d 617, 626 fn. 6 (Ky.1978).

13. Applying statutes that are in the words of the family court below "similar" to KRS 199.520(2), a number of states have reached our same conclusion. *See In re Adoption of Luke*, 263 Neb. 365, 640 N.W.2d 374, 379 (Neb.2002); *In re Adoption of M.C.D.*, 42 P.3d 873, 881, 882 n. 6 (Okla.App.2001); *In re C.R.H.*, 620 N.W.2d 175, 179 (N.D.2000); *In re Adoption of Baby Z*, 247 Conn. 474, 724 A.2d 1035, 1056 n. 36 (1999)(The Connecticut legislature reacted to this decision by amending its adoption statutes. *See* Conn.Gen.Stat. §§ 45a–724(a)(2) and (3); 45a–731(5), (6) and (7)); *In re Adoption of Doe*, 130 Ohio App.3d 288, 719 N.E.2d 1071, 1072–73 (1998); *In re Adoption of T.K.J.*, 931 P.2d 488, 492 (Colo. App.1996); *In re Angel Lace M.*, 184 Wis.2d 492, 516 N.W.2d 678, 682–83 (1994); *In re M.M.*, 156 Ill.2d 53, 189 Ill.Dec. 1, 619 N.E.2d 702, 708 (Ill.1993); *see also, Wheeler v. Wheeler*, 281 Ga. 838, 642 S.E.2d 103, 104 (Ga.2007)(Carley, J., dissenting from denial of discretionary review of case presenting similar facts.); *and see In re Thompson*, 11 S.W.3d 913 (Tenn.Ct.App.1999) (court declined to find either statutory or common-law *de facto* parentage claim for same-sex partner of biological mother who had been involved in child's conception and upbringing).

The issue presented is whether appellant, not the spouse of the natural father, may become an adopting parent of his child, when the father gives only "qualified" consent, specifically retaining his parental rights.

This, of course, is the same legal question now faced by this Court. Pennsylvania adoption law at that time was substantively similar to current Kentucky adoption law. Applying that law, the court in *E.M.A.* held the only circumstance under which a Pennsylvania adoption would not terminate the biological parents' rights was when the adoptive parent was married to the biological parent. *E.M.A.*, 409 A.2d at 11–12. Three years after *E.M.A.* was rendered, the Pennsylvania legislature changed Pennsylvania law in such a way that it now "affords the trial court discretion to decree the adoption [to a nonspouse] without termination of the legal parent's rights[.]" *R.B.F.*, 803 A.2d at 1202. Pennsylvania adoption law is now *dis* similar to Kentucky law. What is still the same, however, is the obligation to maintain judicial integrity by applying legislatively, not judicially, created policy.

> We note that our decision is not creating a judicial exception to the requirements of the Adoption Act, but rather is applying the plain meaning of the terms employed by the Legislature.

*Id.*

The family court also cites *In re Hart*, 806 A.2d 1179 (Del.Fam.Ct.2001). But this case is hardly relevant. Two factors make *Hart* inapposite. First, there was no biological parent in *Hart*. Instead, the case addressed the legal impact to the first adoptive parent of her child's subsequent adoption by a second parent. *Hart*, 806 A.2d at 1186. Consequently, there was never an issue regarding the termination of a biological parent's rights. Second, the Delaware legislature, unlike that of Kentucky, instructed Delaware courts to liberally construe the adoption statutes.

> In 1992 when the General Assembly rewrote Delaware's Adoption Law, the resulting statutory scheme left no question—if there was any question—as to how provisions of the adoption statute should be construed—namely with the so called "generous liberal acceptance and liberal construction."

*Hart*, 806 A.2d at 1184 (citation omitted).

By contrast, since 1933 and before, Kentucky courts have consistently held, without correction by Kentucky's Legislature, that our adoption laws must be strictly construed. *Carter v. Capshaw*, 249 Ky. 483, 60 S.W.2d 959, 962 (1933)("The legal act of adoption is purely statutory, and the statute authorizing the adoption must be strictly complied with."), *citing Villier v. Watson's Adm'x*, 168 Ky. 631, 182 S.W. 869, 871 (1916); *see also, Day v. Day*, 937 S.W.2d 717, 719 (Ky.1997) *and Wright v. Howard*, 711 S.W.2d 492, 494 (Ky.App. 1986), *citing Goldfuss v. Goldfuss*, 565 S.W.2d 441, 442 (Ky.1978), *Jouett v. Rhorer*, 339 S.W.2d 865, 866 (Ky.1960); *Higgason v. Henry*, 313 S.W.2d 275, 276 (Ky. 1958).

While these factors make *Hart* inapposite, there was, once again, a principle that the family court should have taken from that case but did not. The Delaware court rendered its decision consistently with its state's statutory law. *Hart*, 806 A.2d at 1185 ("Interpreting Delaware's statute to allow 'second parent' adoptions is therefore, consistent with the legislative mandate[.]").

The family court also relied on a New York decision, *Matter of Jacob; Matter of Dana*, 86 N.Y.2d 651, 636 N.Y.S.2d 716, 660 N.E.2d 397 (1995). The cases presented facts similar to the case *sub judice*. The distinguishing characteristic of this

case is not the facts. The stark difference is between the adoption laws of our two states.

The majority opinion in *Jacob/Dana* bemoaned the "long, tortuous history [of] New York's adoption statute[,]" which had been "[a]mended innumerable times since its passage in 1873," resulting in a "complex and not entirely reconcilable patchwork" of adoption law. *Jacob/Dana*, 636 N.Y.S.2d 716, 660 N.E.2d at 400. The New York court emphasized that this was the "point of overriding significance" in arriving at its result.[14] *Id.*

New York's adoption statutes do not admit of the clarity of Kentucky adoption statutes. While the majority in *Jacob/Dana* vowed to "strive to give effect to every word of a statute," it excused itself from doing so by "recogniz[ing] the difficulty—perhaps unique difficulty—of such an endeavor here." *Id.* ("[T]he questions posed by these appeals [in *Jacob/Dana*] are not readily answerable by reference to the words of a particular [statutory] section of the law.").

In the final analysis, however, the New York court returned to its duty and found that statutory language "added only recently" created an ambiguity in the adoption laws leaving the question "open to two differing interpretations as to whether [adoption by a non-spouse of the biological parent] automatically terminates parental rights in all cases[.]" *Jacob/Dana*, 636 N.Y.S.2d 716, 660 N.E.2d 402, 405. This allowed the court to interpret the statute to permit adoption by unmarried but cohabiting couples without terminating the biological mother's parental rights. *Id.* at 397 ("New York law now allows the parties ... to 'agree to different terms' as to the nature of the biological parents' postadoptive relationship with the child." Quoting N.Y. Soc. Serv. Law § 383–c).

*Jacob/Dana* is not without its critics.[15] First to criticize its holding were the three dissenting New York Supreme Court justices who summarized their objections in a single sentence.

[T]he dispositional methodology [implemented by the majority] transcends in-

---

**14.** The dissent's view that New York adoption law remains clear suggests, and we suspect, that this was merely an excuse for reaching the desired result. The majority opinion in *Jacob/Dana* reveals itself early in the opinion as a results-oriented decision. The court's circuitous analysis of New York adoption law belies what appears to be a compulsion to rule that an unmarried cohabitant of a child's biological mother may adopt the child without terminating the mother's parental rights, saying, "[t]o rule otherwise would mean that the thousands of New York children actually being raised in homes headed by two unmarried persons could have only one legal parent, not the two who want them." *Jacob/Dana*, 636 N.Y.S.2d 716, 660 N.E.2d at 398.

**15.** *Jacob/Dana* has been criticized or distinguished by several New York appellate court panels which cited it. *Matter of Adoption of Baby Boy D.*, 177 Misc.2d 636, 676 N.Y.S.2d 862, 865, 866 (N.Y.Sur.1998)("[T]his analysis [in *Jacob/Dana*] may be questioned[.]"); *In re*

*Adoption of Carl*, 184 Misc.2d 646, 709 N.Y.S.2d 905, 908 fn6. (N.Y.Fam.Ct.2000)(*Jacob[/Dana]* has not made it clear whether the termination of parental rights statute should be given a literal reading.); *In re Jessalyn AA*, 276 A.D.2d 97, 717 N.Y.S.2d 786, 787 (N.Y.A.D. 3 Dept. 2001)(Court would not extend rationale of *Jacob/Dana* to allow Petitioner to adopt child of former paramour. "[W]e find the language of the statute [interpreted in *Jacob/Dana*] free from ambiguity [and] note particularly that the failure of the Legislature to include a provision ... allowing prospective adoptive parents in petitioner's situation to file a petition for adoption is considered presumptively intentional."); *In re Adoption of A.*, 189 Misc.2d 500, 733 N.Y.S.2d 571, 573–74 (N.Y.Fam.Ct.2001)(Court would not extend *Jacob/Dana* beyond facts of that case and strictly construed adoption laws to prohibit petitioner from adopting child because he was married to someone other than child's mother.).

stitutional limitations on this Court's proper exercise of its authority, fixed by internal discipline and by the external distribution of powers among the branches of government.

*Jacob/Dana*, 636 N.Y.S.2d 716, 660 N.E.2d at 406 (Bellacosa, J., dissenting). Disputing the majority's analysis of the adoption laws of New York, the dissenting justices said, "The statutory language and its history instructively reveal no legislative intent or hint to extend the right and responsibility of adoption to cohabiting unmarried adults." *Id.* at 408.

Furthermore, the dissent took the majority to task for ignoring a doctrine of statutory construction, referenced by this Court, *supra*, that spans time and jurisdiction: "*expressio unius est exclusio alterius*—where a statute mentions certain exceptions and omits others, the Legislature intends that the omitted items should be excluded[.]" *Id.*

> The failure of the Legislature to provide for the circumstances of these two cases examined in the light of successive particularized legislative amendatory actions, is yet another cogent refutation of the uniquely judicial authorization of adoption, unfurled today under the twin banners of statutory interpretation and ambiguity.

*Id.* at 408–09. Kentucky follows this doctrine. *Fiscal Court of Jefferson County v. Brady*, 885 S.W.2d 681, 685 (Ky.1994), *quoting Smith v. Wedding*, 303 S.W.2d 322, 323 (Ky.1957)("It is a primary rule of statutory construction that the enumeration of particular things excludes the idea of something else not mentioned."). It is obvious that no Kentucky statutes enumerate "stepparent-like" adoption. The family court failed to recognize that fact.

The dissent in *Jacob/Dana* offered two warnings which we embrace. The first directly responds to attorney Zeller's plea to the family court that it should act because "the legislation hasn't caught up with many, many people who are in the shadows of what our Christian nation views as family." Said the *Jacob/Dana* dissent, we must avoid "augment[ing] extant legislation in these cases [simply] because the *corpus juris* does not reflect modern arrangement in which individuals nevertheless yearn to be accorded family status[.]"

> [T]he judicial process is not permitted to rove generally over the scene of human affairs. Instead, it must be used, on pain of violating the proprieties, within the framework of a highly disciplined special system of legal rules characteristic of the legal order.

*Id.* at 409 (citation and internal quotation marks omitted).

Second, the dissent in *Jacob/Dana* cautioned against the seductiveness of the concept of "the best interests of the child."

> The judicial power to grant an adoption cannot be exercised, however, by simply intoning the phrase "the best interests of the adoptive child" as part of the analysis to determine qualification for adoption. That approach bypasses crucial, threshold steps and begs inescapably interwoven questions that must be considered and answered at the outset of the purely statutory construction issue in these cases. Before a court can arrive at the ultimate conclusion that an adoption is in the best interests of a child therefore, it is first obliged to discern whether the particular application is legislatively authorized. Reversing the analysis erects the building before the foundation is in place.

*Id.* In Kentucky, these are not merely wise admonitions the family court failed to heed. They are constitutional mandates too well understood to require further citation to the law of our own jurisdiction.

■ The family court also cited as support for her decision the New Jersey case of *Matter of Adoption of Two Children by H.N.R.*, 285 N.J.Super. 1, 666 A.2d 535 (1995). The case was decided by a 2–1 majority which acknowledged rendering its decision "in the context of a non-traditional family unit, which, according to the literature, is one of increasing currency." *Id.* at 536 (footnote omitted). The court then held that the "touchstone" of New Jersey adoption law was "the best interests of children[.]" *Id.* at 538. Furthermore, the New Jersey court blatantly disregarded universal rules of statutory construction, *H.N.R.*, 666 A.2d at 541 (Wefing, J., dissenting), when it held that its adoption statutes "should not be read literally"[16] and that "[s]ince the statute does not expressly prohibit such adoptions ... it should be read as permitting them."[17] *Id.* at 538.

Finally, the family court relied upon *Sharon S. v. Superior Court of San Diego County*, 31 Cal.4th 417, 2 Cal.Rptr.3d 699, 73 P.3d 554 (2003). As with all of these cases, the obstacle the court faced was a statute that terminated a biological parent's legal ties to a child upon its adoption. *Sharon S.*, at 560.

> The birth parents of an adopted child are, from the time of the adoption, relieved of all parental duties towards, and all responsibility for, the adopted child, and have no right over the child.

Cal.Fam.Code § 8617 (2003).

*Sharon S.* turned on "whether [the statute's provisions] are for the benefit of [the parties to an adoption petition] or are instead for a public purpose, and (2) whether there is any language in [the statute] prohibiting a waiver." *Id.* at 561 (brackets in original). If the statute was for the biological parent's benefit, and no statutory language prohibited doing so, the parent could waive operation of the statute. *Id.* The California court found that the legislature's use of the word "relieved" indicated it intended the statute to be primarily for the benefit of the biological parent who, by the adoption, became unfettered from the duties and responsibilities of parenthood. *Id.* Therefore, said the California court, the statute could be waived, and was waived.

While the family court may have found this statute to be "similar to Kentucky's statute," we cannot agree. As we expressed *supra*, the Kentucky statute that serves this function, KRS 199.520(2), is grounded in public policy and cannot be waived. *Jouett v. Rhorer*, 339 S.W.2d 865, 868 (Ky.1960); *Sluder v. Marple*, 134 S.W.3d 15, 17 (Ky.App.2003)(Termination of the biological parent's parental rights "is demanded by public policy.").

We find no justifiable basis on which the family court could avoid the clear language of Kentucky's adoption laws. Nor is there a good faith argument for the extension of those laws to accomplish what appears to have been achieved in different courts in different states under different statutes applying different, and often suspect, legal principles. The cases upon which the fam-

---

**16.** Kentucky courts, and according to the dissent in *H.R.N.*, New Jersey courts as well, "have a duty to accord to words of a statute their literal meaning unless to do so would lead to an absurd or wholly unreasonable conclusion." *McElroy v. Taylor*, 977 S.W.2d 929, 931 (Ky.1998).

**17.** In Kentucky, a court is precluded from taking this approach by "a primary rule of statutory construction that the enumeration of particular things excludes the idea of something else not mentioned." *Fiscal Court of Jefferson County v. Brady*, 885 S.W.2d 681, 685 (Ky.1994)(known by the Latin, *expressio unius est exclusio alterius.*).

ily court relied have no application to Kentucky adoption law, either directly or by analogy. This reasoning and interpretation of foreign law is thoroughly and entirely trumped by Kentucky's specific statutes governing adoption.

"Stepparent-like" adoption does not exist under the laws of Kentucky. We wish to make this point perfectly clear. Regardless of the specific outcome of this case, which is circumscribed by these specific facts, KRS 199.520(2) makes a biological parent's retention of parental rights on the one hand, and his or her consent to the adoption of his or her child by a non-spouse on the other, mutually exclusive options under the law.

### IX. Cabinet Participation Is Required in Every Adoption Case; Cabinet Consent Is Required Unless Unreasonably or Arbitrarily Withheld

 S argues that Cabinet participation was required in this case but was thwarted and, further, that the Cabinet's withholding of consent to the adoption was improperly disregarded. We agree with both points.

With regard to S's first contention, we take note of the Jefferson Family Court's own rules that admonish lawyers and judges to ignore arguments that Cabinet participation is ever unnecessary. JFRP A, *supra* at fn. 2. While KRS 199.470(4)(a) makes the Cabinet's *pre*-petition participation unnecessary in some circumstances, KRS 199.510 requires the Cabinet's *post*-petition notification and participation in every adoption. KRS 199.510(1). That participation is in the form of an investigation and report to the court conducted and prepared by the Cabinet or its designee. Only if the Cabinet or its designee is unable to make the report may the court then designate some other person, agency or institution to perform that function. KRS 199.510(2). In fact, the Supreme Court has indicated that no adoption hearing should be scheduled until *"[a]fter the report of the guardian ad litem, if any, for the child and the report required by KRS 199.510 have been filed[.]" Baker v. Webb,* 127 S.W.3d 622, 626 (Ky.2004)(emphasis supplied).

 S is also correct that the Cabinet's lack of consent in this case was disregarded. Our Supreme Court has previously held that "a trial court [now also family court] could not properly allow the adoption without the permission of the Department [now Cabinet] unless that permission was arbitrarily or unreasonably withheld." *Com., Dept. of Child Welfare v. Jarboe,* 464 S.W.2d 287, 291 (Ky.1971). In this case, the family court permitted the adoption despite the fact that the Cabinet withheld its consent. The Cabinet's position that granting the adoption would require the termination of S's parental rights was well-founded and avoiding that was clearly in Z's best interest. Therefore, the Cabinet's withholding of consent was not arbitrary or unreasonable.

The family court's grant of the adoption absent Cabinet consent was contrary to law. S is again correct that this adoption was invalid.

### X. KRS 199.540(2) Bars S's Collateral Attack of the Judgment of Adoption

 The family court held that "any attack, whether direct or collateral, against a void judgment of adoption due to lack of jurisdiction is prevented after the expiration of one year. KRS 199.540(2)." S argues to the contrary, citing *Gullett v. Gullett,* 992 S.W.2d 866 (Ky.App.1999) for the proposition that "[t]he question of subject matter jurisdiction may be raised at any time and is open for the consideration of the reviewing court whenever it is raised by any party." *Gullett* at 869.

While this rule has nearly universal application, we believe it is inapplicable here because the Legislature, in the exercise of its considerable prerogative, expressed in the strongest terms possible the public policy that adoption judgments are to be unassailable after the expiration of one year.

Even absent a statute, "courts have been hesitant to upset an adoption decree" for "lack of requisite consent or such other procedural irregularity." *Allen v. Martin,* 735 S.W.2d 332, 333 (Ky.App.1987), *citing* 2 Am Jur.2d, § 82.5, § 76, *Adoption* (1962). The Legislature merely subsumed that judicial policy as part of its own expression of public policy when it enacted KRS 199.540(2) and its predecessor statutes. The statute itself has a long interpretive history. More than a half century ago, our highest court held that the statute meant that after the prescribed period, no one could "attack a judgment of adoption for 'irregularity in procedures.'" *Jones v. Sutton,* 255 S.W.2d 658, 659 (Ky.1953).

In 1994, Kentucky's legislature amended KRS 199.540(2). 1994 Ky.Acts Ch. 242, § 9, eff. 7–15–94. Our review of the amendment convinces us that the Legislature intended to limit attacks on adoptions even further than under the previous versions of the statute or the common law.

Before the amendment, the period of prohibition did not begin until two years had elapsed from the date of entry of the judgment of adoption. And the prior version prohibited any "attack in any procedure, collateral or direct, by reason of any irregularity in procedures[.]" KRS 199.540(2)(1993).

After the amendment, the period of prohibition began after the expiration of only one year and the prohibition on the methods of attack was broadened even further. The phrase "attack in any procedure" was clarified as "attack in any *action.*" KRS

199.540(2)(2008). The change was more than cosmetic. This court had previously defined the term "action" in the context of statutes of limitations very broadly as "judicial proceedings." *Metts v. City of Frankfort,* 665 S.W.2d 318, 319 (Ky.App. 1984). Changing the wording of the statute from "procedure" to "action" eliminated any suggestion that the statute did not prohibit attack by means of an action independent of the adoption proceeding itself. *See, e.g., Pierce v. Pierce,* 522 S.W.2d 435, 436 (Ky.1975)("David filed an independent action attacking the judgment of adoption.").

More significantly, the Legislature clarified that the attack could not challenge, either collaterally or directly, "any irregularity or *failure to comply with KRS 199.470 to 199.520, either procedurally or substantively.*" KRS 199.540(2). (Emphasis supplied). We deem these amendatory efforts by the Legislature to be as absolute as statutory language will allow, leaving the possibility of attack after one year available only in the most extraordinary cases.

Therefore, subject to the narrowest of exceptions discussed *infra,* we conclude that a CR 60.02 motion, even one based on lack of subject matter jurisdiction, is untimely if brought more than one year after entry of the judgment of adoption. The family court's denial of S's CR 60.02 motion in the adoption case cannot be said to have been an abuse of discretion. *Whittington v. Cunnagin on Behalf of Englert,* 925 S.W.2d 455, 456 (Ky.1996)(appellate review of lower court's denial of relief pursuant to CR 60.02 if for abuse of discretion).

### A. The exception to KRS 199.540(2)

As noted in *Storm v. Mullins,* 199 S.W.3d 156 (Ky.2006), foreclosing the vast majority of attacks on the validity of judg-

ments of adoption after one year is good policy and well-reasoned.

> This prohibition ensures the finality of adoption judgments, thereby minimizing the potential for traumatic changes in the lives of adoptive parents and children long after their relationship has been formalized.

*Storm* at 161.

In *Storm*, a mother filed a CR 60.02 motion to set aside the adoption of her two children by her ex-husband's parents. The motion was filed two-and-one-half years after entry of the judgment of adoption. Ultimately the case was remanded to the trial court to determine whether considerations of due process required the judgment of adoption to be set aside. However, the opinion indicates that, absent due process considerations, KRS 199.540(2) would prohibit the mother's challenge of the judgment. "Despite irregularities in the adoption proceedings, such judgments are not ordinarily subject to review after one year under Kentucky law.... That being said, Kentucky case law contemplates the possibility that the limitation statute is not absolute." *Id.*

The Supreme Court cited *Jones, supra,* as having indicated, but not addressed, at least one example of an exception to the finality requirement of KRS 199.540(2). In *Jones*, our predecessor Court of Appeals was "inclined to the view that *if a* forgery constitutes a *fraud upon the court,* the judgment might be adjudged void without regard to statutory limitations based upon 'irregularity'." *Jones*, 255 S.W.2d at 659 (emphasis added).

We interpret *Jones*, consistently with *Storm*, as holding that when an adoption is effected by means of a fraud practiced upon the court, whether by means of a forgery or otherwise, the void nature of the adoption is sufficiently beyond mere irregularity in the adoption proceedings. *See Storm*, 199 S.W.3d at 162 ("We have never allowed an exception to the limitation period merely for a failure to follow the procedural requirements.").

There is no question that the Judgment of Adoption, and the order of joint custody as well, were accomplished in disregard of several statutory requirements and various procedural rules. But despite the infestation of error in these cases, and for the reasons described below, we do not find that a fraud was perpetrated upon the Jefferson Family Court.

## B. Absence of fraud upon the court in this case

In *Terwilliger v. Terwilliger,* 64 S.W.3d 816 (Ky.2002), our Supreme Court said that what constitutes a fraud upon the court [18]

> "is quite broad and allows for flexibility in the determination of what constitutes 'fraud affecting the proceedings' where the net effect would cause an unjust judgment to stand." [7 Kurt A. Philipps, Jr., *Kentucky Practice*, CR 60.02, cmt. 6 (5th ed.1995) ]. While finality of judgment is a laudable goal, it cannot take precedence over the fair and equitable resolution of disputes.

---

**18.** The terms "fraud upon the court" and "fraud affecting the proceedings" have been used throughout our jurisprudence largely interchangeably. For example, in CR 60.02(d), the term used is "fraud affecting the proceedings." Under the federal rule from which our rule was derived, the term is still "fraud upon the court." Under Kentucky's predecessor to

CR 60.02, Ky. Civ.Code of Prac. § 518(4), the phrase used was "fraud practiced by the successful party in obtaining the judgment[,]" but this phrase was interpreted by our courts as "fraud upon the court" or "fraud practiced upon the court." *See, e.g., Greene v. Fitzpatrick*, 220 Ky. 590, 295 S.W. 896, 898 (Ky.1927)(using both phrases).

*Terwilliger,* 64 S.W.3d at 819. The current edition of the authority relied upon by the Supreme Court in *Terwilliger* now expresses this concept in more direct terms: "Courts should not take a narrow interpretation of 'fraud affecting the proceedings'[.]" 7 Kurt A. Philipps, Jr., David V. Kramer & David W. Burleigh, *Kentucky Practice,* CR 60.02, cmt. 6 (7th ed.2005).

The broader view of fraud upon the court has remained constant throughout our jurisprudence. In *Triplett v. Stanley,* 279 Ky. 148, 130 S.W.2d 45 (1939), our former Court of Appeals said that fraud upon the court

is not confined to vicious import of a wicked motive or deliberate deceit, etc., purposely conceived, but embraces merely leading astray, throwing off guard, or lulling to security and inaction, be its intention or motives good or bad.

*Triplett,* 130 S.W.2d at 47.

As broad as our concept of fraud upon the court may be, it does not include a court's knowing acceptance of the zealous articulation of a novel, even erroneous, theory of law. We view what occurred in this case in the same light as did one party whose argument was considered in a seasoned Missouri opinion.

To constitute fraud in procuring a judgment the court rendering the judgment must be deceived; material facts must be concealed from it which, if disclosed, would have caused it to render a different judgment. If it appears that the court was cognizant of the facts, and with those facts before it rendered a judgment, then it is a valid judgment, however erroneous it may be, and can not be canceled on the ground of fraud, unless the court intentionally participated in the fraud. There is no allegation in this case that the court intentionally acted fraudulently in rendering the judgment in question.

*Williams v. Gerber,* 75 Mo.App. 18, 1898 WL 1742, p. 2 (Mo.App.1898).

Here, the family court was not deceived. Aware that S and T were the same gender, were not married, and could not be married, and further aware that the Cabinet disapproved of the adoption, the family court simply proceeded as the parties mutually petitioned the court to proceed. While some facts may not have been timely revealed, neither were they intentionally concealed by the parties, and the family court acknowledged its own lack of inquisitiveness. However lacking we may find the family court's legal reasoning, no matter how sharply we may question its judgment or motives, we cannot say that what occurred here was fraud upon the court.

Nor can we say that S was deceived. If a party chooses to put faith in the opinion of her lawyers or even in the court, it must be at her own hazard. The proper time to have challenged the custody order or the judgment of adoption was when each was entered. Because the order and judgment represented her own desires at the time, she chose not to take an appeal from either. Had she done so, we have no doubt both would have been reversed. But having failed to do so, S cannot now claim relief merely because she hired a new counsel who presents a different, albeit correct, view of the law as applied to the proceedings below. As damaging as S's acquiescence in the family court's decisions may be, she is entitled to no more relief than that to which she would have been entitled if the court had committed any other error, and she had submitted to it till it was too late to redress it. Unless she had been prevented by some fraud of the other party from making a legal defense, she must submit and abide the consequences of her own folly or negligence. Here no fraud on T's part is alleged. Fraud was not the reason for S's decision

not to object to the adoption or make any defense to T's petition. Nor was any act of T the reason S decided not to take an appeal from the custody order or judgment of adoption.

Because fraud upon the court is not present in this case, we are compelled to respect the express public policy that, after one year, all adoption judgments are final, irrevocable and not subject to attack. However, we also find, within the context of these unique facts, that S's parental rights were not terminated by operation of KRS 199.520(2).

## XI. A Balancing of Competing Public Policies Necessitates S's Retention of Parental Rights

■ We have determined that the judgment of adoption in this case was erroneous for a variety of reasons. However, as we have also noted, no one appealed from this judgment and it became final more than a year before anyone ever objected to it. An erroneous judgment, once final, is no less binding than one that is correct in every way. *Wallace v. Ashland Oil & Transp. Co.*, 305 S.W.2d 541, 544 (Ky.1957).

■ Among the errors in this judgment is the family court's determination, contrary to KRS 199.520(2), that S retained her parental rights as to Z. "The strong and sensible policy of the law in favor of the finality of judgments has historically been overcome only in the presence of the most compelling equities." *Bishir v. Bishir*, 698 S.W.2d 823, 826 (Ky. 1985). That policy was properly expressed by our judicial branch[19] to preclude parties to a judgment, and those in privity with them, from relitigating the same issues. We believe that, by enacting KRS 199.540(2), the Legislature intended not only to ratify this judicial expression of policy, but to expand it in adoption cases, as a matter of public policy, to be effective as to all persons without regard to their lack of participation in the adoption proceeding itself.

However, the public policy expressed in KRS 199.540(2), as applied to S's retention of parental rights in this case, directly conflicts with the public policy expressed in KRS 199.520(2) that those same rights must terminate. Resolution of this case, then, necessarily requires a balancing of these competing public policies. We will do so, however, we also believe that a third public policy, expressed in KRS 402.040(2) and Section 223A of Kentucky's Constitution prohibiting same-sex marriage, has no place in our analysis. Our analysis would result in an identical outcome if T had been S's heterosexual male partner.

While both expressions of public policy are equally significant, we conclude under the facts of this case that equities weigh in favor of allowing this judgment of adoption, as erroneous as it is, to stand. To do otherwise would only further victimize Z whose welfare this Court now views as paramount in this case.

The public policy expressed in KRS 199.520(2) cannot be circumvented by the equitable doctrines of waiver or estoppel, nor by fallacious legal fictions, but it must yield to the Legislature's mandate, expressed in KRS 199.540(2), that, absent fraud on the court, all aspects of every judgment of adoption, however error-laden, shall be unassailable after the expiration of one year from the date of its entry. While S is unquestionably correct that the judgment of adoption was invalid, that judgment was redeemed and made valid by operation of KRS 199.540(2).

---

19. *See* footnote 9, *supra*.

This opinion should not be interpreted as an invitation by other practitioners, nor authorization of the family courts, to intentionally evade any aspect of the adoption laws by replicating the facts or practice of this case. We believe we have made it clear that this case should never have proceeded as far as it has and trust that no others will.

## XII. Denial of S's CR 60.02 Motion in the Custody Case Was Improper

■ We have already held that S's CR 60.02 motion in the adoption case is untimely because of the operation of KRS 199.540(2). But KRS 199.540(2) does not apply to custody orders. Our consideration of the family court's denial of CR 60.02 relief in the custody matter remains.

■ The basis for that denial was "[S's] failure to file her motion in a reasonable time; [her] full knowledge of all facts at the time the agreed order was entered; and clean hands doctrine." As previously noted, we review a lower court's denial of relief pursuant to CR 60.02 for abuse of discretion. *Whittington v. Cunnagin on Behalf of Englert*, 925 S.W.2d 455, 456 (Ky.1996). In the custody case, we believe the court abused its discretion.

The family court's order acknowledged that it lacked subject matter jurisdiction when it entered the custody order. For reasons set forth in the family court's order denying CR 60.02 relief, we agree.

■ A judgment entered by a court without subject matter jurisdiction is void *ab initio*. *See Covington Trust Co. of Covington v. Owens*, 278 Ky. 695, 129 S.W.2d 186, 190 (Ky.1939); *Wagner v. Peoples Bldg. & Loan Ass'n*, 292 Ky. 691, 167 S.W.2d 825, 826 (Ky.1943); *Commonwealth Health Corp. v. Croslin*, 920 S.W.2d 46, 48 (Ky.1996); 20 Am.Jur.2d Courts § 65 at 380. A void judgment is not enti-

tled to any respect or deference by the courts. *Mathews v. Mathews*, 731 S.W.2d 832, 833 (Ky.App.1987). It is "a legal nullity, and a court has no discretion in determining whether it should be set aside." *Foremost Ins. Co. v. Whitaker*, 892 S.W.2d 607, 610 (Ky.App.1995). In addition, since subject matter jurisdiction concerns the very nature and origins of a court's power to act at all, it "cannot be born of waiver, consent or estoppel[,]" *Nordike v. Nordike*, 231 S.W.3d 733, 738 (Ky.2007)(internal quotation marks and citation omitted).

■ Because "the question of subject matter jurisdiction may be raised at any time and is open for the consideration of the reviewing court whenever it is raised by any party," *Gullett v. Gullett*, 992 S.W.2d 866, 869 (Ky.App.1999), S was entitled to challenge it when she did. And, since the family court had no discretion with regard to setting that order aside, *Foremost* at 610, the exercise of any discretion declining to do so was an obvious abuse of the court's discretion. We therefore reverse the Jefferson Family Court's order denying S's motion to set aside the custody order.

## XIII. The Proper Standard Upon Remand for Custody Determination

Affirming the adoption but reversing the custody order necessitates the family court's reconsideration of the custody issue which will require guidance from this Court. Again, we are faced with a dilemma. "[T]he child [Z,] shall be deemed the child of [T] and shall be considered . . . for all . . . legal considerations, the natural child of [T] the same as if born of [her] bod[y.]" KRS 199.520(2). And, because the judgment made unassailable by KRS 199.540(2) ordered S's retention of parental rights, she and T must start on an equal footing with regard to which of them is entitled to Z's custody. *Davis v. Davis,*

619 S.W.2d 727, 729–30 (Ky.App. 1981)("[W]e are required to treat [the biological parent] and [the adoptive parent] equally, that is, to ignore the fact of adoption and make our decision as if [the adoptive parent] were the natural father of appellant's child."). However, our Legislature never contemplated the possibility that custody would have to be decided under circumstances such as these.

Our instinct is to instruct the family court to determine custody pursuant to KRS 403.270. But we have recently been told that "KRS 403.270 does not govern whether a trial court has subject-matter jurisdiction to determine custody of children in cases not involving a dissolution of marriage." *J.N.R. v. O'Reilly,* 264 S.W.3d 587 (Ky., 2008). We hardly need express the point that no dissolution of marriage is involved in this case. Therefore, if we cannot turn directly to KRS 403.270, we must determine proper authorization and guidance otherwise.

We begin with Section 112 of the Kentucky Constitution which says:

> The Supreme Court may designate one or more divisions of Circuit Court within a judicial circuit as *a family court* division. A Circuit Court division so designated *shall retain the general jurisdiction of the Circuit Court* and shall have additional jurisdiction as may be provided by the General Assembly.

Ky. Const. § 112(6). If the family court "retain[s] the general jurisdiction of the Circuit Court[,]" then we look to articulations of the scope of that jurisdiction, conveniently expressed in the same constitutional provision. "The Circuit Court shall have original jurisdiction of all justiciable causes not vested in some other court." Ky. Const. § 112(5). No other court than the family court has been vested with the jurisdiction to determine custody in this case.

■ Furthermore, custody determinations predate statutory guidelines and are part of our common law, although the common law principles were not as well defined. *Compare, e.g., Sowders v. Sowders,* 286 Ky. 269, 150 S.W.2d 903, 906 (1941)("Under the common law, generally, the father was entitled to the custody of his infant child[.]"); *with Basham v. Wilkins,* 851 S.W.2d 491, 492 (Ky.App. 1993)("At common law, the mother, as natural guardian, had the sole right to custody and control of the child." (Citation omitted)), *superseded by statute on other grounds as recognized in Elery v. Martin,* 4 S.W.3d 550 (Ky.App.1999). Therefore, we conclude that the family court, as a court of general jurisdiction, is authorized to determine custody between Z's two parents. Our view is that this analysis is not inconsistent with our Supreme Court's recent ruling in *J.N.R. v. O'Reilly, supra,* since the original petitioner in *J.N.R.* was never determined to be the child's parent. Here, T was adjudicated Z's parent.

■ Additionally, the common law also recognizes the duty of all parents to provide for their children. *Colovos' Adm'r v. Gouvas,* 269 Ky. 752, 108 S.W.2d 820, 827 (1937)("[I]t was by common law ... that the father shall furnish them [his children] necessaries."). Similarly, the common law presumes the right of a non-custodial parent to be awarded visitation. *Finley v. Finley,* 8 Ky.L.Rptr. 605, 2 S.W. 554, 555 (Ky.1887)(Though mother abused morphine and opium and cavorted with prostitutes, "order should be entered permitting the mother to see the daughter [Sunshine, age 5,] at stated intervals[.]").

Consequently, we believe the family court is authorized, independently of statute, to make determinations of custody, visitation and child support. Still we must select the proper standards to apply in

making these various determinations. It would be fruitless to analyze and apply the ancient standards that predate Chapter 403. In the final analysis, our instinct was correct. Though utilization of KRS 403.270 and the rest of Chapter 403 is not mandated, it provides the family court with the best guidance for determining appropriate custody, visitation and support, even in this unusual, we pray unique, case. The family court may entertain a motion to modify the original petition in this case, or one or both of the parties may initiate a new action in which to seek these determinations.

## XIV. Legal Questions versus Political Questions; Justice in the Abstract versus Justice According to Law

We pause at this juncture to highlight the common element that runs through all of the cases from the various jurisdictions addressing the general issue of stepparent-like, second-parent, or similar adoptions. It is the same "elephant in the room" in this case. The function of the Judiciary is to answer the *legal* question whether "stepparent-like" adoptions are permitted under Kentucky law. Courts are constitutionally prohibited from addressing the *political* question, "Why not?" Furthermore, judges sitting on those courts are prohibited from allowing their own abstract view of the political question to affect in any degree the proper determination of the legal question.

It is not this or any court's role to judge whether the Legislature's prohibition of same-sex marriage, or common law marriage, or bigamous marriage, or polygamous marriage, is morally defensible or socially enlightened. Nor is it this or any court's role, in the absence of constitutional repugnance, to craft any means by which the legal consequences of such a prohibition may be negated or avoided. It is simply the law.

Nor does the fact that T and S are homosexual have any bearing whatsoever on the void nature of this joint custody order and this judgment of adoption.[20] The merits and defects of both order and judgment exist regardless of the parties' relationships, genetic makeup, pre-dispositions or personal choices.

The lawyers in this case obviously desired to affect the public policies at play in this case that, in their view, negatively impact their clients. They would have been perfectly justified in petitioning the Legislature, or encouraging their clients to do so, for an amendment to the adoption laws that would permit an unmarried person to adopt a non-spouse's child without terminating the non-spouse's parental rights. But rather than taking this proper route to change, they sought to achieve their goal through this branch of government. Their stratagem, so clearly contrary to statute and public policy, could only succeed in a receptive environment. The record tells us that Zeller found such an environment.

---

20. Our Legislature has been clear enough that T's sexual orientation does not affect her right to adopt a child, or to seek joint or sole custody of a child, under proper circumstances set forth by statute. *See, generally, B.F. v. T.D.*, 194 S.W.3d 310 (Ky.2006). It was and is possible for T to satisfy the conditions set out in the former KRS 403.420(4)(c), KRS 403.270 and KRS 405.020(3). Had T complied with these statutes, she could have lawfully shared joint custodianship of Z with S. Similarly, T has never been prohibited from adopting Z. KRS 199.470(1)("Any person who is eighteen (18) years of age and who is a resident ... may file a petition for leave to adopt a child[.]"). She simply could not do so without bringing about the termination of S's parental rights.

As the family court acknowledged, "stepparent-like" adoption had been embraced by three or four divisions of Jefferson Family Court. According to Zeller, judicial acceptance of her efforts came with a knowing "wink-wink, nod-nod, and look around[.]" [21] Wherever this legal fiction has been used, its supposed benefactors were misled. Its proponents simply applied the fiction to evade, for a single segment of our society, the public policy of the People of this Commonwealth. To do so is constitutionally impermissible, regardless of the identity of the group.

We take issue with any legal professional, and will reverse any court, for exempting any person or group from the uniform application of our laws merely because of their membership in a particular subset of society. Ky. Const § 1 ("All men [and women] are equal[.]"); Ky. Const § 3 ("All men are equal and no grant of ... privileges shall be made to any man or set of men[.]"). In short, however, that is exactly what occurred here.

The fact that T and S are homosexual should have had no bearing on the lawyers' representations of their clients, nor on the family court's application of the law, at any stage of this proceeding. Unfortunately, the parties' sexuality preference or some other unidentified factor such as sympathy for their plight, impaired the way the legal professionals viewed the law.

Zeller, Gatewood and Kellerman unwisely participated in an adoption by two people who were not even living together, to say nothing of the fact that they were not married, or even committed, to one another. Would Gatewood have thought it pru-

dent to permit his client to consent to this adoption if T were actually S's *former husband?* Would Kellerman also have failed to question Z's adoption by a *former stepfather* who had already divorced her client's mother, thereby risking the termination of the legal relationship between Z and S? We think not.

It is significant that the legal professionals were all on the same page here. Because these proceedings were carried out in "friendly suit" manner, without the presentation of a countervailing legal position, and without even the objective participation of the Cabinet, the parties lost all benefit of an otherwise *adversarial* system. The court alone was left to question the legality of what the parties and their lawyers sought. To the extent the family court did challenge Zeller's theory, that challenge was inadequate.

However, with crowded dockets and limited resources, and relying to a large degree on the attorneys to present the law and facts in conformity with CR 11, we tend to understand how the family court let down its guard. It may not have been until attorney Zeller thanked the "family court *judges who have so graciously given to gay couples these rights* " that the judge below realized what had occurred in her court. When asked what Kentucky adoption law said about stepparent-like adoption, too many professionals relied on the punchline of an old and bad attorney joke and responded, "What do you want it to say?"

Only the Cabinet acknowledged what Kentucky's adoption laws actually said. In this case, it was not enough that the Cabi-

**21.** Attorney Zeller indicated in her argument on October 14, 2005, that gay rights advocates were thwarted in their efforts to arrange adoptions by gay individuals of the children of their same-sex partners because gay marriage is not recognized in Kentucky. "And now we're looking back to find all sorts of hooks to throw the legal fiction that we all—wink-wink, nod-nod, and look around—to give equal protection, equal rights, to gay couples." (VR No. 1: 10/14/05; 15:05:05 to 15:05:31).

net wrote two letters articulating the law. We trust that this opinion has eliminated the possibility of future attempts at step-parent-like adoptions under our current law. However, should similar circumstances ever present themselves again, it is our hope that the Cabinet would exercise its right to intervene in the action for the proper purpose of establishing the proceeding as adversarial and presenting its relevant position on the law and the facts of the particular adoption case. Had the Cabinet done so in this case, a timely appeal could have remedied the numerous errors in this case before they became indelible.

## XV. Conclusion

Failures to strictly adhere to the adoption laws have resulted in some painful decisions in Kentucky. *See, e.g., Proffitt v. Evans,* 433 S.W.2d 876 (Ky.1968); *Com., Dept. of Child Welfare v. Jarboe,* 464 S.W.2d 287 (Ky.1971); *L.S.J. v. E.B.,* 672 S.W.2d 937 (Ky.App.1984). The decision in this case was destined to join their ranks. Lawyers succeeded in satisfying their clients' initial desires, but at what price? The integrity of the law has taken a blow. May we take solace in the hope that, in the end, Z has benefited by our decision.

For the foregoing reasons, the Order Overruling [Appellant's] Motion to Set Aside the Judgment of Adoption is AF-FIRMED, and the Order Overruling [Appellant's] Motion to Set Aside Custody Judgment is REVERSED. The order of the Jefferson Circuit Court, Family Division Five, entered August 16, 2001, awarding permanent joint custody of Appellant's biological child, Z, to the Appellant and Appellee is hereby VACATED as void *ab initio.*

The case is REMANDED for further orders of the Jefferson Circuit Court,

Family Division Five, as are consistent with this opinion.

LAMBERT, Judge, Concurs.

KELLER, Judge, Concurs in Result Only.